R.R. *vs.* M.H. & another.[1]

Worcester. October 7, 1997. - January 22, 1998.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, MARSHALL, & IRELAND, JJ.

*Parent and Child,* Surrogacy agreement. *Public Policy. Contract,* Surrogacy agreement.

Discussion of statutory provisions in other States addressing the issue of surrogate parenting agreements [506-507], and discussion of appellate court opinions regarding the enforceability of such agreements [507-508].

The legal significance of a surrogacy agreement concerning a child conceived and born in Massachusetts to a Massachusetts resident is appropriately determined by Massachusetts law. [508]

This court concluded that the provisions of G. L. c. 46, § 4B, do not apply to a child of a married surrogate mother. [509-510]

This court concluded that, in light of the policies expressed in the Massachusetts adoption statute at G. L. c. 210, §§ 2 and 11A, and in 102 Code Mass. Regs. § 5.09 (1997), a surrogate parenting agreement will be given no effect if the mother's agreement to surrender custody of the child was obtained prior to a reasonable time, that is, before the fourth day after the child's birth, or if her agreement was induced by the payment of money beyond pregnancy-related expenses [510]; further, any such custody agreement is subject to a judicial determination of custody based on the best interests of the child [512].

In an action seeking a determination of the validity of a surrogate parenting agreement, this court concluded, on public policy grounds, that the mother's consent to surrender custody was of no effect where it was given in consideration of a payment of $10,000, and before the fourth day after the child's birth, and that the surrogacy agreement was unenforceable. [511-512]

CIVIL ACTION commenced in the Worcester Division of the Probate and Family Court Department on June 25, 1997.

A motion for preliminary injunctive relief was heard by *Susan D. Ricci,* J., and questions of law were reported to the Appeals Court by her. After consolidation of all matters in the Appeals Court, the Supreme Judicial Court transferred them on its own initiative.

[1]D.H., the husband of M.H.

*Elaine M. Epstein* (*Juliet A. Davison* with her) for the mother.
*Carol A. Erskine,* guardian ad litem.
*Margaret Clapp-Winchester* for the father.
The following submitted briefs for amici curiae:
*Joyce M. Brousseau,* pro se.
*John J. Weltman* for The American Surrogacy Center, Inc.
*Susan L. Crockin* for Boston Fertility Society & another.

WILKINS, C.J. On a report by a judge in the Probate and Family Court, we are concerned with the validity of a surrogate parenting agreement between the plaintiff (father) and the defendant (mother). Both the mother and the father are married but not to each other. A child was conceived through artificial insemination of the mother with the father's sperm, after the mother and father had executed the surrogate parenting agreement. The agreement provided that the father would have custody of the child. During the sixth month of her pregnancy and after she had received funds from the father pursuant to the surrogacy agreement, the mother changed her mind and decided that she wanted to keep the child.

The father thereupon brought this action and obtained a preliminary order awarding him temporary custody of the child. The mother's appeal from that order is moot because the parties have since agreed on custody and visitation and the judge has approved that agreement. We, therefore, do not discuss the circumstances of the temporary custody order, and nothing we say in this opinion should be understood to suggest that the subjects of custody or visitation need be reconsidered. The judge's order granting the preliminary injunction is before us on her report of the propriety of that order which was based in part on her conclusion that the father was likely to prevail on his assertion that the surrogacy agreement is enforceable. On our own motion, we transferred here the appeal and the report, which a single justice of the Appeals Court had consolidated. The question of the enforceability of the surrogacy agreement is before us and, although we could defer any ruling until there is a final judgment entered, the issue is one on which we elect to comment because it is fully briefed and is of importance to more than the parties. This court has not previously dealt with the enforceability of a surrogacy agreement.

## THE FACTS

The baby girl who is the subject of this action was born on

August 15, 1997, in Leominster. The defendant mother and the plaintiff father are her biological parents. The father and his wife, who live in Rhode Island, were married in June, 1989. The wife is infertile. Sometime in 1994, she and the father learned of an egg donor program but did not pursue it because the procedure was not covered by insurance and had a relatively low success rate. Because of their ages (they were both in their forties), they concluded that pursuing adoption was not feasible. In April, 1996, responding to a newspaper advertisement for surrogacy services, they consulted a Rhode Island attorney who had drafted surrogacy contracts for both surrogates and couples seeking surrogacy services. On the attorney's advice, the father and his wife consulted the New England Surrogate Parenting Advisors (NESPA), a for-profit corporation that helps infertile couples find women willing to act as surrogate mothers. They entered into a contract with NESPA in September, 1996, and paid a fee of $6,000.

Meanwhile, in the spring of 1996, the mother, who was married and had two children, responded to a NESPA advertisement. She reported to NESPA that her family was complete and that she desired to allow others less fortunate than herself to have children. The mother submitted a surrogacy application to NESPA. The judge found that the mother was motivated to apply to NESPA by a desire to be pregnant, in order to earn money, and to help an infertile couple.

In October, Dr. Angela Figueroa of NESPA brought the mother together with the father and his wife. They had a seemingly informative exchange of information and views. The mother was advised to seek an attorney's advice concerning the surrogacy agreement. Shortly thereafter, the mother, the father, and his wife met again to discuss the surrogacy and other matters. The mother also met with a clinical psychologist as part of NESPA's evaluation of her suitability to act as a surrogate. The psychologist, who also evaluated the father and his wife, advised the mother to consult legal counsel, to give her husband a chance to air his concerns, to discuss arrangements for contact with the child, to consider and discuss her expectations concerning termination of the pregnancy, and to arrange a meeting between her husband and the father and his wife.[2] The psycholo-

---

[2] Her husband had had a vasectomy in 1994 and did not have sexual relations with the mother after October, 1996.

gist concluded that the mother was solid, thoughtful, and well grounded, that she would have no problem giving the child to the father, and that she was happy to act as a surrogate. The mother told the psychologist that she was not motivated by money, although she did plan to use the funds received for her children's education. The mother's husband told the psychologist by telephone that he supported his wife's decision.

The mother signed the surrogate parenting agreement and her signature was notarized on November 1. The father signed on November 18. The agreement stated that the parties intended that the "Surrogate shall be inseminated with the semen of Natural Father" and "that, on the birth of the child or children so conceived, Natural Father, as the Natural Father, will have the full legal parental rights of a father, and surrogate will permit Natural Father to take the child or children home from the hospital to live with he [*sic*] and his wife." The agreement acknowledged that the mother's parental rights would not terminate if she permitted the father to take the child home and have custody, that the mother could at any time seek to enforce her parental rights by court order, but that, if she attempted to obtain custody or visitation rights, she would forfeit her rights under the agreement and would be obligated to reimburse the father for all fees and expenses paid to her under it. The agreement provided that its interpretation would be governed by Rhode Island law.

The agreement provided for compensation to the mother in the amount of $10,000 "for services rendered in conceiving, carrying and giving birth to the Child." Payment of the $10,000 was to be made as follows: $500 on verification of the pregnancy; $2,500 at the end of the third month; $3,500 at the end of the sixth month; and $3,500 at the time of birth "and when delivery of child occurs." The agreement stated that no payment was made in connection with adoption of the child, the termination of parental rights, or consent to surrender the child for adoption. The father acknowledged the mother's right to determine whether to carry the pregnancy to term, but the mother agreed to refund all payments if, without the father's consent, she had an abortion that was not necessary for her physical health. The father assumed various expenses of the pregnancy, including tests, and had the right to name the child. The mother would be obliged, however, to repay all expenses

and fees for services if tests showed that the father was not the biological father of the child, or if the mother refused to permit the father to take the child home from the hospital. The agreement also provided that the mother would maintain some contact with the child after the birth.

The judge found that the mother entered into the agreement on her own volition after consulting legal counsel. There was no evidence of undue influence, coercion, or duress. The mother fully understood that she was contracting to give custody of the baby to the father. She sought to inseminate herself on November 30 and December 1, 1996. The attempt at conception was successful.

The lawyer for the father sent the mother a check for $500 in December, 1996, and another for $2,500 in February. In May, the father's lawyer sent the mother a check for $3,500. She told the lawyer that she had changed her mind and wanted to keep the child. She returned the check uncashed in the middle of June. The mother has made no attempt to refund the amounts that the father paid her, including $550 that he paid for pregnancy-related expenses.

## PROCEDURE

Approximately two weeks after the mother changed her mind and returned the check for $3,500, and before the child was born, the father commenced this action against the mother seeking to establish his paternity, alleging breach of contract, and requesting a declaration of his rights under the surrogacy agreement. Subsequently, the wife's husband was added as a defendant. The judge appointed a guardian ad litem to represent the interests of the unborn child. Proceedings were held on aspects of the preliminary injunction request (now resolved) and on the mother's motion to determine whether surrogacy contracts are enforceable in Massachusetts.

On August 4, 1997, the judge entered an order directing the mother to give the child to the father when it was discharged from the hospital and granting the father temporary physical custody of the child. She did so based on her determination that the father's custody claim was likely to prevail on the merits of the contract claim, and, if not on that claim, then on the basis of the best interests of the child. The mother was granted the right to frequent visits.

On August 13, 1997, the judge reported the propriety of her August 1 order which, as we have said, was based in part on her conclusion that the surrogacy contract was enforceable. She acknowledged that specific questions were not reportable under Mass. R. Dom. Rel. P. 64 (1997) (see *Gray* v. *Commissioner of Revenue*, 422 Mass. 666, 667-668 [1996]), but nevertheless set forth the questions that appear in the margin.[3] The judge determined to continue with an inquiry into the best interests of the child, while appellate proceedings were continuing. She conducted further hearings, and, shortly before the case was argued in this court, she filed a procedural history and supplemental findings dated October 3, 1997.

### OTHER JURISDICTIONS

A significant minority of States have legislation addressing surrogacy agreements. Some simply deny enforcement of all such agreements. See Ariz. Rev. Stat. Ann. § 25-218(A) (West 1991); D.C. Code Ann. § 16-402(a) (1997); Ind. Code Ann. §§ 31-20-1-1, 31-20-1-2 (Michie 1997); Mich. Comp. Laws Ann. § 722.855 (West 1993); N.Y. Dom. Rel. Law § 122 (McKinney Supp. 1997)[4]; N.D. Cent. Code § 14-18-05 (1991); Utah Code Ann. § 76-7-204 (1995). Others expressly deny enforcement only if the surrogate is to be compensated. See Ky.

---

[3] "1. Is a surrogacy contract enforceable, wherein a woman, the egg donor, provides child bearing services to a man, the semen donor, and delivers to him physical custody of their child in exchange for monetary consideration, and which further provides that she retains her constitutional rights to abortion during pregnancy and to parental rights after the birth of the child, but conditions and limits the exercise of those rights, unless she forgoes the benefits of the contract and/or makes restitution of benefits already received?

"If the answer to the question on contract enforceability is affirmative, secondary questions that derive from the primary question are:

"2. If the surrogate mother has received payment for her services, is specific performance an appropriate remedy for her breach, as to the provision that she relinquish physical custody of the child when born?

"3. Under what circumstances would such a contract be unconscionable?"

[4] This statute changed the law established in *Adoption of Baby Girl L.J.*, 132 Misc. 2d 972 (N.Y. Sur. Ct. 1986), in which the court approved the terms of a surrogate parenting agreement which required the payment of compensation to the surrogate and delivery of the child to the natural father and his wife for adoption. See *Adoption of Paul*, 146 Misc. 2d 379, 385 (N.Y. Fam. Ct. 1990), voiding a surrogacy agreement and approving adoption of the child only if the surrogate agreed not to accept compensation from the intended parents.

Rev. Stat. Ann. § 199.590(4) (Michie 1995)[5]; La. Rev. Stat. Ann. § 9:2713 (West 1991); Neb. Rev. Stat. § 25-21,200 (1995); Wash. Rev. Code §§ 26.26.230, 26.26.240 (1996). Some States have simply exempted surrogacy agreements from provisions making it a crime to sell babies. See Ala. Code § 26-10A-34 (1992); Iowa Code § 710.11 (1997); W. Va. Code § 48-4-16(e)(3) (1996). A few States have explicitly made unpaid surrogacy agreements lawful. See Fla. Stat. ch. 742.15 (1995); Nev. Rev. Stat. § 126.045 (1995); N.H. Rev. Stat. Ann. § 168-B:16 (1994 & Supp. 1996); Va. Code Ann. §§ 20-159, 20-160(B)(4) (Michie 1995). Florida, New Hampshire, and Virginia require that the intended mother be infertile. See Fla. Stat. ch. 742.15(2)(a); N.H. Rev. Stat. Ann. § 168-B:17(II) (1994); Va. Code Ann. § 20-160(B)(8). New Hampshire and Virginia place restrictions on who may act as a surrogate and require advance judicial approval of the agreement. See N.H. Rev. Stat. Ann. §§ 168-B:16(I)(b), 168-B:17; Va. Code Ann. §§ 20-159(B), 20-160(B)(6).[6] Last, Arkansas raises a presumption that a child born to a surrogate mother is the child of the intended parents and not the surrogate. Ark. Code Ann. § 9-10-201(b),(c) (Michie 1993).

There are few appellate court opinions on the enforceability of traditional surrogacy agreements. The Kentucky Legislature, as indicated in note 5 *supra*, has provided that a compensated surrogacy agreement is unenforceable (Ky. Rev. Stat. Ann. § 199.590[4]), thus changing the rule that the Supreme Court of Kentucky announced in *Surrogate Parenting Assocs., Inc.* v. *Commonwealth ex rel. Armstrong*, 704 S.W.2d 209 (Ky. 1986). In *In re Marriage of Moschetta*, 25 Cal. App. 4th 1218 (1994), the court declined to enforce a traditional surrogacy agreement because it was incompatible with California parentage and adoption statutes. *Id.* at 1222. The surrogate, who was to be paid $10,000, had agreed that (a) the father could obtain sole custody

---

[5]This statute in effect overruled *Surrogate Parenting Assocs., Inc.* v. *Commonwealth ex rel. Armstrong*, 704 S.W.2d 209 (Ky. 1986), in which the Supreme Court of Kentucky held that a compensated surrogate parenting procedure did not violate a statute prohibiting the buying and selling of babies. *Id.* at 211.

[6]New Hampshire permits the surrogate to opt out of the agreement to surrender custody at any time up to seventy-two hours after birth. N.H. Rev. Stat. Ann. § 168-B:25(IV) (1994). Virginia allows a surrogate who is the child's genetic mother to terminate the agreement within 180 days of the last assisted conception. Va. Code Ann. § 20-161(B) (Michie 1995).

of any resulting child, (b) she would agree to terminate her parental rights, and (c) she would aid the father's wife in adopting the child. *Id.* at 1223. The court sent the case back to the trial court for a determination whether the father should be awarded primary physical custody. *Id.* at 1234.

The best known opinion is that of the Supreme Court of New Jersey in *Matter of Baby M.*, 109 N.J. 396 (1988), where the court invalidated a compensated surrogacy contract because it conflicted with the law and public policy of the State. *Id.* at 411. The *Baby M* surrogacy agreement involved broader concessions from the mother than the agreement before us because it provided that the mother would surrender her parental rights and would allow the father's wife to adopt the child. *Id.* at 412. The agreement, therefore, directly conflicted with a statute prohibiting the payment of money to obtain an adoption and a statute barring enforcement of an agreement to adoption made prior to the birth of the child. *Id.* at 422. The court acknowledged that an award of custody to the father was in the best interests of the child, but struck down orders terminating the mother's parental rights and authorizing the adoption of the child by the husband's wife. *Id.* at 411. The court added that it found no "legal prohibition against surrogacy when the surrogate mother volunteers, without any payment, to act as a surrogate and is given the right to change her mind and to assert her parental rights." *Id.* at 469.

## DISCUSSION

1. *The governing law.* The agreement before us provided that "Rhode Island Law shall govern the interpretation of this agreement." No party has argued that Rhode Island law has any application to the issues before us.[7] We are, in any event, not concerned with "the interpretation of this agreement," but rather with the legal significance, if any, of its provisions. The child was conceived and born in Massachusetts, and the mother is a Massachusetts resident, all as contemplated in the surrogacy arrangement. The significance, if any, of the surrogacy agreement on the relationship of the parties and on the child is appropriately determined by Massachusetts law.

[7]It appears that Rhode Island does not have statutes similar to those in Massachusetts (G. L. c. 210, §§ 2, 11A) which, as will be seen, provide us guidance.

*2. General Laws c. 46, § 4B.* The case before us concerns traditional surrogacy, in which the fertile member of an infertile couple is one of the child's biological parents. Surrogate fatherhood, the insemination of the fertile wife with sperm of a donor, often an anonymous donor, is a recognized and accepted procedure.[8] If the mother's husband consents to the procedure, the resulting child is considered the legitimate child of the mother and her husband. G. L. c. 46, § 4B.[9] Section 4B does not comment on the rights and obligations, if any, of the biological father, although inferentially he has none. In the case before us, the infertile spouse is the wife. No statute decrees the consequences of the artificial insemination of a surrogate with the sperm of a fertile husband. This situation presents different considerations from surrogate fatherhood because surrogate motherhood is never anonymous and the mother's commitment and contribution is unavoidably much greater than that of a sperm donor.[10]

We must face the possible application of G. L. c. 46, § 4B, to this case. Section 4B tells us that a husband who consents to the artificial insemination of his wife with the sperm of another is considered to be the father of any resulting child. In the case before us, the birth mother was married at the time of her artificial insemination. Despite what he told the psychologist, her husband was not supportive of her desire to become a surrogate parent but acknowledged that it was her decision and her body. The husband, who filed a complaint for divorce on August

---

[8]In *Adoption of Galen*, 425 Mass. 201 (1997), and in *Adoption of Tammy*, 416 Mass. 205 (1993), each involving the surrogate fatherhood of a child, we upheld the right of a woman to adopt the child of a woman with whom she had a committed relationship.

[9]General Laws c. 46, § 4B, states: "Any child born to a married woman as a result of artificial insemination with the consent of her husband, shall be considered the legitimate child of the mother and such husband."

[10]A situation which involves considerations different from those in the case before us arises when the birth mother has had transferred to her uterus an embryo formed through in vitro fertilization of the intended parents' sperm and egg. This latter process in which the birth mother is not genetically related to the child (except coincidentally if an intended parent is a relative) has been called gestational surrogacy. In *Johnson* v. *Calvert*, 5 Cal. 4th 84, 96, cert. denied, 510 U.S. 874, and cert. dismissed sub nom. *Baby Boy J.* v. *Johnson*, 510 U.S. 938 (1993), the Supreme Court of California gave effect to a contract that provided that the mother of a child born as a result of a gestational surrogacy would be the egg donor and not the surrogate. *Id.*

8, 1997, may have simply been indifferent because he knew that the marriage was falling apart. The judge found that he was not the biological father of the child. His interest might have been vastly greater if he had been informed that § 4B literally says that any child produced by the artificial insemination of his wife with his consent would be his legitimate child whom he would have a duty to support. It is doubtful, however, that the Legislature intended § 4B to apply to the child of a married surrogate mother. Section 4B seems to concern the status of a child born to a fertile mother whose husband, presumably infertile, consented to her artificial insemination with the sperm of another man so that the couple could have a child biologically related to the mother.

3. *Adoption statutes.* Policies underlying our adoption legislation suggest that a surrogate parenting agreement should be given no effect if the mother's agreement was obtained prior to a reasonable time after the child's birth or if her agreement was induced by the payment of money. Adoption legislation is, of course, not applicable to child custody, but it does provide us with some guidance. Although the agreement makes no reference to adoption and does not concern the termination of parental rights or the adoption of the child by the father's wife, the normal expectation in the case of a surrogacy agreement seems to be that the father's wife will adopt the child with the consent of the mother (and the father). Under G. L. c. 210, § 2, adoption requires the written consent of the father and the mother but, in these circumstances, not the mother's husband. Any such consent, written, witnessed, and notarized, is not to be executed "sooner than the fourth calendar day after the date of birth of the child to be adopted." *Id.* That statutory standard should be interpreted as providing that no mother may effectively agree to surrender her child for adoption earlier than the fourth day after its birth, by which time she better knows the strength of her bond with her child. Although a consent to surrender custody has less permanency than a consent to adoption, the legislative judgment that a mother should have time after a child's birth to reflect on her wishes concerning the child weighs heavily in our consideration whether to give effect to a prenatal custody agreement. No private agreement concerning adoption or custody can be conclusive in any event because a

judge, passing on custody of a child, must decide what is in the best interests of the child.[11]

Adoptive parents may pay expenses of a birth parent but may make no direct payment to her. See G. L. c. 210, § 11A; 102 Code Mass. Regs. § 5.09 (1997). Even though the agreement seeks to attribute that payment of $10,000, not to custody or adoption, but solely to the mother's services in carrying the child, the father ostensibly was promised more than those services because, as a practical matter, the mother agreed to surrender custody of the child. She could assert custody rights, according to the agreement, only if she repaid the father all amounts that she had received and also reimbursed him for all expenses he had incurred. The statutory prohibition of payment for receiving a child through adoption suggests that, as a matter of policy, a mother's agreement to surrender custody in exchange for money (beyond pregnancy-related expenses) should be given no effect in deciding the custody of the child.

4. *Conclusion.* The mother's purported consent to custody in the agreement is ineffective because no such consent should be recognized unless given on or after the fourth day following the child's birth. In reaching this conclusion, we apply to consent to custody the same principle which underlies the statutory restriction on when a mother's consent to adoption may be effectively given. Moreover, the payment of money to influence the mother's custody decision makes the agreement as to custody void. Eliminating any financial reward to a surrogate mother is the only way to assure that no economic pressure will cause a woman, who may well be a member of an economically vulnerable class, to act as a surrogate. It is true that a surrogate enters into the agreement before she becomes pregnant and thus is not presented with the desperation that a poor unwed pregnant woman may confront. However, compensated surrogacy arrangements raise the concern that, under financial pressure, a woman will permit her body to be used and her child to be given away.

There is no doubt that compensation was a factor in inducing the mother to enter into the surrogacy agreement and to cede custody to the father. If the payment of $10,000 was really only

---

[11]In the case of a divorce, a judge may approve an agreement between parents concerning child custody unless the judge makes specific findings that the agreement would not be in the best interests of the child. G. L. c. 208, § 31.

compensation for the mother's services in carrying the child and giving birth and was unrelated to custody of the child, the agreement would not have provided that the mother must refund all compensation paid (and expenses paid) if she should challenge the father's right to custody. Nor would the agreement have provided that final payment be made only when the child is delivered to the father. We simply decline, on public policy grounds, to apply to a surrogacy agreement of the sort involved here the general principle that an agreement between informed, mature adults should be enforced absent proof of duress, fraud, or undue influence.

We recognize that there is nothing inherently unlawful in an arrangement by which an informed woman agrees to attempt to conceive artificially and give birth to a child whose father would be the husband of an infertile wife. We suspect that many such arrangements are made and carried out without disagreement.

If no compensation is paid beyond pregnancy-related expenses and if the mother is not bound by her consent to the father's custody of the child unless she consents after a suitable period has passed following the child's birth, the objections we have identified in this opinion to the enforceability of a surrogate's consent to custody would be overcome. Other conditions might be important in deciding the enforceability of a surrogacy agreement, such as a requirement that (a) the mother's husband give his informed consent to the agreement in advance; (b) the mother be an adult and have had at least one successful pregnancy; (c) the mother, her husband, and the intended parents have been evaluated for the soundness of their judgment and for their capacity to carry out the agreement; (d) the father's wife be incapable of bearing a child without endangering her health; (e) the intended parents be suitable persons to assume custody of the child; and (f) all parties have the advice of counsel. The mother and father may not, however, make a binding best-interests-of-the-child determination by private agreement. Any custody agreement is subject to a judicial determination of custody based on the best interests of the child.

The conditions that we describe are not likely to be satisfactory to an intended father because, following the birth of the child, the mother can refuse to consent to the father's custody even though the father has incurred substantial pregnancy-related expenses. A surrogacy agreement judicially approved before conception may be a better procedure, as is permitted by

statutes in Virginia and New Hampshire. A Massachusetts statute concerning surrogacy agreements, pro or con, would provide guidance to judges, lawyers, infertile couples interested in surrogate parenthood, and prospective surrogate mothers.[12]

We do not reach but comment briefly on the mother's argument that the agreement was unconscionable. She actively sought to become a surrogate and entered into the surrogacy agreement voluntarily, advised by counsel, not under duress, and fully informed. Unconscionability is not apparent on this record.

A declaration shall be entered that the surrogacy agreement is not enforceable. Such further orders as may be appropriate, consistent with this opinion, may be entered in the Probate and Family Court.

*So ordered.*

---

[12]The National Conference of Commissioners on Uniform State Laws has approved alternative proposals concerning surrogacy agreements. One alternative simply states that "[a]n agreement in which a woman agrees to become a surrogate or to relinquish her rights and duties as parent of a child thereafter conceived through assisted conception is void." Uniform Status of Children of Assisted Conception Act, Alternative B, § 5, 9B U.L.A. 208 (Master ed. Supp. 1997). The other alternative provides for judicial approval of an agreement before conception if various conditions are met and allows the payment of compensation. *Id.* at 201-207, Alternative A, §§ 5, 6, 9 (a).