that the neighbor, aunt or cousin enjoys an undiminished right to sue for non-economic losses arising out of an automobile accident. In my opinion, these incongruities and unintended results would be avoided if the term "child", as used in *N.J.S.A.* 39:6A–8.1a, is construed to mean minor or dependent children.

Thus, I would reverse.

772 A.2d 948

A.H.W. AND P.W., PLAINTIFFS,[1] v. G.H.B., AND JOHN J. FARMER, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS.

Superior Court of New Jersey
Chancery Division
Family Part
Bergen County

Decided April 4, 2000.

---

[1] Due to the sensitive nature of the issues presented, initials have been used in the caption. *See, Stern v. Stern,* 66 *N.J.* 340, 343, 331 *A.*2d 257(1975). Fictional first names will be used to assist in understanding the complex relationships between the parties.

*Melissa Brisman*, for plaintiffs A.H.W. and P.W. (*MacFall, Reidl & Miskowski*).

*Susan M. Slaff*, Deputy Attorney General, for the State of New Jersey.

KOBLITZ, P.J.F.P.

The novel issue presented in this surrogacy matter is whether or not a court may issue a pre-birth order directing a delivering physician to list the man and woman who provided the embryo carried by a third party as legal parents on a child's birth certificate. Both the petitioning biological parents and the defendant surrogate who carried the baby agree that petitioners should be listed as the legal parents on the baby's birth certificate. However, the Attorney General's Office opposes the request of the biological parents for a pre-birth order claiming the relief is contrary to the law prohibiting surrender of a birth mother's rights until seventy-two hours after birth, and the public policy of

the State of New Jersey as expressed by the New Jersey Supreme Court in *In re Baby M,* 109 *N.J.* 396, 537 *A.*2d 1227 (1988). After considering case law and statutes in other states as well as New Jersey, this Court denies plaintiffs and the defendant surrogate's request for a pre-birth order, but will issue an order which allows the petitioning biological parents' names to be placed on the birth certificate after the seventy-two hour statutory waiting period has expired but before the birth certificate must be filed. To understand this unusual relief, the facts of this case must be explored, then a review of other states' law in this area, followed by a consideration of New Jersey case law, public policy implications and statutes.

## FACTS

G.H.B., hereinafter "Gina," is the unmarried sister of plaintiff A.H.W., "Andrea," and the sister-in-law of P.W., "Peter." The biological parents, Andrea and Peter, entered into a gestational surrogacy contract with Gina. Gina, without financial compensation, agreed to have embryos implanted into her uterus that were created from the sperm of her brother-in-law, Peter, and the ova of her sister, Andrea. This medical procedure is commonly referred to as "ovum implantation," and permits a woman who is incapable of carrying a baby to term to have a child who is genetically related to her. The child is due to be born in about two weeks at a Bergen County hospital.

Plaintiffs filed a complaint to declare the maternity and paternity of unborn Baby A. Plaintiffs seek a pre-birth order establishing them as the legal mother and father of unborn Baby A, and placing their names on the child's birth certificate. They argue that a pre-birth order is appropriate with a gestational surrogacy.

Gestational surrogacy and surrogate motherhood are the two currently recognized forms of surrogacy arrangements. A "surrogate mother" is the genetic mother and gives birth to a child formed from her ova and either the sperm of the husband of an infertile couple, or that of a sperm donor. *See* Weldon E. Havins

& James J. Dalessio, *Reproductive Surrogacy at the Millennium: Proposed Model Legislation Regulating "Non Traditional" Gestational Surrogacy Contracts,* 31 McGeorge L.Rev. 673, 675 (2000). The husband has a biological link with the child if his sperm is used, and his wife has the opportunity to adopt and raise the child. The wife has no genetic relationship to the baby. In contrast, a surrogacy arrangement involving a "gestational carrier" is one where there is no genetic relationship between the woman giving birth and the fetus. *R.R. v. M.H., D.H.,* 426 Mass. 501, 509, 689 *N.E.*2d. 790, 795 (1998). Rather, the gestational surrogate carries embryos fertilized by both the husband and wife of an infertile couple. *See id.* Gestational surrogacy, unlike surrogate motherhood, gives the wife of an infertile couple the opportunity to be biologically related to the baby and ensures that the woman who gives birth is not genetically linked to the child.

## LAW FROM OTHER STATES

Plaintiffs argue that an order should be issued pre-birth as requested because the gestational carrier has no biological link or legal rights to the fetus. In support of their position, plaintiffs cite to surrogacy procedures authorizing pre-birth orders utilized in California and Massachusetts, where the courts have dealt with the issue and in Florida, where gestational surrogacy is governed by statute.

The first case in California regarding gestational surrogacy contracts is *Johnson v. Calvert,* 5 Cal.4th 84, 19 *Cal.Rptr.*2d 494, 851 *P.*2d 776, *cert. denied* 510 *U.S.* 874, 114 *S.Ct.* 206, 126 *L.Ed.*2d 163, *cert. dismissed* 510 *U.S.* 938, 114 *S.Ct.* 374, 126 *L.Ed.*2d 324 (1993). In that case, Mr. and Mrs. Calvert were approached by Ms. Johnson who volunteered to act as a surrogate after learning from a mutual acquaintance of Mrs. Calvert's inability to carry a baby. *Id.* at 87, 851 *P.*2d 776. The parties entered into a contract which provided that Ms. Johnson would carry to term an embryo fertilized with Mr. Calvert's sperm and Mrs. Calvert's egg. *Id.* Ms. Johnson agreed to relinquish all parental rights to the couple

who in turn would raise the child. As consideration, the Calverts agreed to pay Johnson $10,000 and to obtain and pay for a $200,000 insurance policy on Ms. Johnson's life. *Id.* Relations between the parties deteriorated when the Calverts learned of Ms. Johnson's previous miscarriages and still births, and Ms. Johnson discovered that the Calverts never obtained the life insurance policy. Ms. Johnson demanded payment of the $10,000 and threatened to keep the baby if the Calvert's did not pay. *Id.* at 88, 851 *P.*2d 776. Both parties filed petitions with the court seeking to be declared the legal parents of the unborn child. *Id.* Mrs. Calvert and Ms. Johnson both claimed to be the baby's natural mother. *Id.* at 93, 851 *P.*2d 776. The baby was born while the litigation was still pending and blood tests conclusively showed that Mrs. Calvert and not Ms. Johnson was the baby's mother. *Id.* at 88, 851 *P.*2d 776.

The California Supreme Court ruled that a gestational surrogate has no parental rights to the child she carries because the infant is not genetically linked to her. The Court gave substantial weight to the fact that the parties intended to bring about the birth of an infant by means of a surrogacy arrangement, and not to donate an embryo to Ms. Johnson. *Id.* at 93, 851 *P.*2d 776. The Calverts "affirmatively intended the birth of the child, and took the steps necessary to effect in vitro fertilization. But for their acted-on intention, the child would not exist." *Id.* Though Ms. Johnson's decision to carry the baby was necessary to facilitate the Calverts' intent, she would not have had the opportunity to gestate the embryo had she manifested an intent to keep the baby. *Id.* The Court concluded that the legal mother is the woman who intended to bring about the conception of the baby with the intent to raise him/her. *Id.* The issue of a pre-birth order was moot in *Calvert* as the litigation concluded after the birth of the child.

Like California and New Jersey, Massachusetts has no statute directly addressing the issuance of pre-birth orders. Only two reported Massachusetts cases address gestational surrogacy, and

while neither case is completely on point with the situation presented here, at least one of the decisions implicitly permitted the issuance of a pre-birth order. In *R.R. v. M.H. & another*, 426 *Mass.* 501, 689 *N.E.*2d 790 (1998), the Supreme Judicial Court of Massachusetts held that the parties' surrogate contract was invalid because it forced the mother to give up custody of the baby prior to its birth. *Id.* at 510, 689 *N.E.*2d at 795. In a footnote, the Court distinguished traditional surrogacy from gestational surrogacy, stating that the two involved different considerations and noted that the gestational surrogate is not the mother of the child she carries. *Id.* at 508, n. 10, 689 *N.E.*2d at 795.

One year later in *Smith v. Brown*, 430 *Mass.* 1005, 718 *N.E.*2d 844 (1999), the Supreme Judicial Court of Massachusetts permitted the Probate and Family Court's decision to issue a pre-birth order in a gestational surrogacy situation to stand. *Id.* While not addressing the issue of pre-birth orders directly, the Court did comment that the procedure used by the Probate and Family Court to enter the pre-birth order was technically incorrect and so implicitly ratified the entry of the pre-birth order while not endorsing the method of entry. *See id.* at 1006, 718 *N.E.*2d at 846.

Unlike Massachusetts, California and New Jersey, in Florida gestational surrogacy is governed by statute. A valid gestational surrogacy contract must comply with the statute's stringent procedural requirements. Valid contracts must include a provision stating that either the commissioning mother is unable physically to gestate a pregnancy to term; or that gestation will cause a risk to the health of the commissioning mother or fetus. *F.S.A.* § 742.15(2)(a)(b) & (c). The contract must recite that the gestational surrogate will be the only one with the power to consent to clinical intervention in the pregnancy, but that she will agree to submit to reasonable medical evaluation and treatment. F.S.A. § 742.15(3)(a) & (b). The commissioning couple must also agree to accept responsibility for the child after birth even if the baby is born with impairments so long as one of the commissioning parents is the genetic parent. F.S.A. § 742.15(3)(d). If neither

commissioning parent is the genetic parent of the infant, the gestational carrier must accept responsibility for the baby. F.S.A. § 742.15(3)(e). The surrogate mother may receive reasonable living, legal and medical expenses. F.S.A. § 742.15(4).

F.S.A. § 742.16 governs the procedure for affirming the genetic parents' status and requires the commissioning couple to file a petition with the court within three days after the birth of a child for an expedited affirmation of parental status. F.S.A. § 742.16(1). A hearing is held after noticing the woman who carried the baby, any person claiming paternity and the treating doctor from the assisted reproductive technology facility. F.S.A. § 742.16(4). The primary purpose of the hearing is to determine the validity of the gestational surrogacy contract, and to ensure that at least one member of the commissioning couple is the genetic parent of the baby. Once the court determines that the contract is valid and one commissioning parent is the genetic parent, the court must issue an order naming the commissioning parents as the baby's legal parents. F.S.A. § 742.16(6). The Court then issues a second order directing the Department of Health to seal the original birth certificate and issue a new one listing the genetic parents as the legal parents of the infant. F.S.A. § 742.16(8). Thus, Florida's statutory scheme does not permit the issuance of pre-birth orders although it does permit gestational surrogacy.

Several states ban surrogacy contracts as contrary to public policy regardless of whether the woman carrying the baby is compensated or not. These include New York, Utah, Michigan and Arizona. *See, N.Y. Dom. Rel. Law* § 123 (McKinney Supp. 1997), *Utah Code Ann.* § 76–7–204(1)(d), *Mich. Comp. Laws Ann.* § 722.855 (West 1993 & Supp.1996), *Ariz.Rev.Stat. Ann.* § 25–218(A). Washington, Louisiana, Nebraska and Kentucky prohibit by statute surrogacy contracts which include a compensation element. Wash. Rev.Code Ann §§ 26.26.230–26.26.240 (West 1997), La.Rev.Stat. Ann. § 9:2713 (West 1991), Neb. Rev. Stat §§ 25–21, 200 (1995), Ky.Rev.Stat. Ann. § 199.590 (Banks–Baldwin

1997). However, courts in these states may in the future permit gestational surrogacy agreements where, as is the case here, there is no compensation given to the woman carrying the baby. *See Havins & Dalessio*, supra, 31 at 687.

### NEW JERSEY CASE LAW

The New Jersey Supreme Court dealt with the issue of surrogate motherhood agreements in the landmark case of *In re Baby M*, 109 *N.J.* 396, 537 *A*.2d 1227 (1988). In *Baby M*, Mr. and Mrs. Stern entered into a contract with Mrs. Whitehead who agreed, for a fee of $10,000, to be artificially inseminated with Mr. Stern's sperm and, upon giving birth, terminate her parental rights so that Mrs. Stern could adopt the child. *Id.* at 412, 537 *A*.2d 1227. Litigation ensued when Mrs. Whitehead refused to give up the baby. *Id.* at 415, 537 *A*.2d 1227.

The Court, in an opinion written by Chief Justice Wilentz, ruled that the surrogacy contract was void because it was contrary to public policy and in direct conflict with then existing laws. *Id.* at 421–22, 537 *A*.2d 1227. The Court found that there was "coercion of contract" because Mrs. Whitehead was forced to give up her child irrevocably prior to conception. *Id.* at 422, 537 *A*.2d 1227. Justice Wilentz wrote that "(t)he whole purpose and effect of the surrogacy contract was to give the father the exclusive right to the child by destroying the rights of the mother." *Id.* at 436, 537 *A*.2d 1227.

Perhaps most troubling to the Court was that Mrs. Whitehead was to be paid a $10,000 fee by the Sterns for providing the ova and carrying the baby to term. Likening the parties' contract to "baby-bartering," the Court expressed its doubt that surrogacy arrangements would continue in the absence of compensation. *Id.* at 438, 537 *A*.2d 1227. Chief Justice Wilentz opined that paid surrogacy contracts exploit a woman's financial need by providing her with economic aid in exchange for her child. *Id.* at 439, 537 *A*.2d 1227. "Whatever idealism may have motivated any of the participants, the profit motive predominates, permeates, and ulti-

mately governs the transaction." *Id.* The Court emphasized that it found "no offense to our present laws where a woman voluntarily and without payment agrees to act as a surrogate mother, provided that she is not subject to a binding agreement to surrender her child." *In re Baby M,* 109 *N.J.* at 411, 537 *A.*2d 1227. Here a pre-birth order would bind Gina to surrendering the baby upon its birth.

## PUBLIC POLICY AND STATUTES

The biological parents, Andrea and Peter, and the gestational surrogate, Gina, argue that Gina has no biological ties to the unborn child and liken the gestational carrier's role to that of an incubator. They argue that *Baby M* is distinguishable because the surrogate mother in that case was also the biological mother. While Andrea, Peter and Gina are correct that Gina will have no biological ties to the baby, their simplistic comparison to an incubator disregards the fact that there are human emotions and biological changes involved in pregnancy.

A bond is created between a gestational mother and the baby she carries in her womb for nine months. During the pregnancy, the fetus relies on the gestational mother for a myriad of contributions. A gestational mother's endocrine system determines the timing, amount and components of hormones that affect the fetus. The absence of any component at its appropriate time will irreversibly alter the life, mental capacity, appearance, susceptibility to disease and structure of the fetus forever. The gestational mother contributes an endocrine cascade that determines how the child will grow, when its cells will divide and differentiate in the womb, and how the child will appear and function for the rest of its life. *"Maternal Fetal Relationships and Nongenetic Surrogates",* 33 *Jurimetrics J.* 387 (1993).

In this case, Gina has previously had one child and therefore had an understanding of what is involved in carrying a pregnancy to term at the time she signed the contract. The problem case will present itself when a gestational mother changes her mind

and wishes to keep the newborn. This may be more likely where a gestational mother has never had a child and is unfamiliar with the emotions and biological changes involved in a pregnancy. She will not be able to predict what her feelings will be towards the child she bears. Her body will undergo significant changes and she will continue to react biologically as any other birth mother. In this case, it seems likely that the transfer of the child will occur without incident due to the close family ties of the parties and Gina's previous experience with childbirth. However, although Gina is extremely likely to surrender her rights as planned, she must not be compelled to do so in a pre-birth order.

New Jersey regulations governing the creation of birth records state that the woman who gives birth must be recorded as a parent on the birth certificate. *N.J.A.C.* 8:2–1.4(a). This regulation would normally necessitate that Gina's name be placed on the birth certificate along with her brother-in-law, Peter, as the father. However, all parties have agreed by written contract that Andrea and Peter's names should be placed on the birth certificate.

In New Jersey, as required by *N.J.S.A.* 26:8–28(a), a birth certificate must be issued and filed within five days of birth with the local registrar of the district in which the birth occurred. Pursuant to *N.J.S.A.* 26:8–30, "the attending physician, midwife or person acting as the agent of the physician or midwife, who was in attendance upon the birth shall be responsible for the proper execution and return of a certificate of birth."

In recognition of the emotional and physical changes in the mother which occur at birth, voluntary surrenders are not valid if taken within seventy-two hours after the birth of the child. *N.J.S.A.* 9:3–41(e). Thus after seventy-two hours have elapsed, Gina will be able to lawfully surrender her parental rights. She will have the responsibility of making decisions for the child during this seventy-two hour period, even if her ultimate decision is to surrender her parental rights.

It is not necessary now to determine what parental rights, if any, the gestational mother may have vis-à-vis the newborn infant. That decision will have to be made if and when a gestational mother attempts to keep the infant after birth in violation of the prior agreement. Here, Gina, Peter and Andrea are closely related. The parties' detailed fifteen page agreement clearly reflects their shared intent and desired outcome for this case. Further, Gina, as Andrea's sister and Peter's sister-in-law knows the biological parents intimately and is in an excellent position to know the type of home they will provide for the child. Thus almost certainly Gina will honor the contract and surrender her rights.

## CONCLUSION

The Legislature may well choose to clarify the rights and responsibilities of parties in a gestational surrogacy. The most prudent course, prior to legislative action, is to follow the current statutes as closely as possible while allowing the parties, to the maximum extent possible, the relief requested. A court order for the pre-birth termination of the pregnant defendant's parental rights is the equivalent of making her subject to a binding agreement to surrender the child and is contrary to New Jersey statutes and *Baby M.* Therefore, the gestational mother may surrender the child seventy-two hours after giving birth, which is forty-eight hours before the birth certificate must be prepared. If Gina does choose to surrender the infant, and she certifies that she wishes to relinquish all rights, then the original birth certificate will list the two biological parents, Andrea and Peter, as the baby's parents. If Gina changes her mind once the baby is born, she will have a chance to litigate for parental rights to the child.

The attending physician who delivers Baby A should prepare a Certificate of Parentage four days after the birth of the child. This waiting period will allow Gina to surrender her parental rights after seventy-two hours and also allow a birth certificate to be issued within five days of birth. After Gina surrenders any

parental rights she might have, the Certificate of Parentage shall be completed with Peter as the legal father and Andrea the legal mother. This solution represents a modification of the agreement between the parties to the least extent necessary to comply with current New Jersey statutes and the public policy concerns expressed by the Supreme Court in *Baby M.*