MARLA CULLITON & another[1] *vs.* BETH ISRAEL DEACONESS
MEDICAL CENTER & another.[2]

Essex. September 6, 2001. - October 12, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Practice, Civil,* Report, Entry of judgment. *Probate Court,* Report, Jurisdiction.
*Jurisdiction,* Probate Court, Equitable. *Parent and Child,* Gestational
surrogacy. *Department of Public Health.*

In a civil action, brought prior to the birth of babies being carried by a
gestational carrier, seeking declaratory and injunctive relief by way of an
order to a hospital to enter the names of the plaintiffs as mother and father
on the birth certificates of the babies when they were born, where the
plaintiffs were the sole genetic sources of the babies; where the gestational
carrier agreed with the order sought; where no one, including the hospital,
had contested the complaint or petition; and where by filing the complaint
and stipulation for judgment, the plaintiffs agreed that they had waived any
contradictory provisions in a gestational carrier contract, the Probate and
Family Court, pursuant to its general equity jurisdiction under G. L. c. 215,
§ 6, had authority to consider the merits of the relief sought. [288-292]
Where a party or parties seeks declaratory and injunctive relief with respect to
any information contained in a birth certificate or with respect to any of
the information required to be supplied by a hospital's reporters pursuant
to G. L. c. 46 and related regulations, the party or parties must notify the
Registrar of Vital Records and Statistics of the commencement of such an
action, and of any orders or judgments concerning the same. [293-295]
This court concluded that a remand was unnecessary in the case of an action
for declaratory judgment in which a stipulation for the entry of judgment
had been submitted by all the parties, and entered a judgment declaring the
plaintiffs as the legal parents of two children that had been delivered by a
gestational carrier, and ordering the hospital to place the plaintiffs' names
on its records of birth as the mother and father of the children. [295]

CIVIL ACTION commenced in the Essex Division of the Probate
and Family Court Department on May 24, 2001.

Following entry of a judgment of dismissal, the case was
reported to the Appeals Court by *John P. Cronin,* J. The

---

[1]Steven Culliton, her husband.

[2]Melissa Carroll.

Supreme Judicial Court on its own initiative transferred the matter from the Appeals Court.

*Melissa B. Brisman* (*Paul J. Klehm* with her) for the plaintiffs.

*Catherine Mahoney*, for Beth Israel Deaconess Medical Center, was present but did not argue.

The following submitted briefs for amici curiae:

*Susan L. Crockin & Pauline Quirion* for Resolve, Inc. & others.

*Robert Nichols* for Boston Fertility Society & others.

*Thomas F. Reilly*, Attorney General, *Stephanie S. Lovell*, Assistant Attorney General, & *Peggy Wiesenberg* for Commissioner of the Department of Public Health & another.

GREANEY, J. We transferred this case here on our own motion to decide whether a judge in the Probate and Family Court had authority to act on the plaintiffs' complaint that sought declaratory and injunctive relief by way of a judgment ordering the defendant Beth Israel Deaconess Medical Center (hospital) "to enter MARLA CULLITON as the mother, and STEVEN CULLITON as the father[,] on the birth certificates of unborn Baby A and unborn Baby B." The children, twins, were born while the case was pending appeal. They are the genetic children of the plaintiffs, who had embryos[3] that had been created from the plaintiff Steven Culliton's sperm[4] and the plaintiff Marla Culliton's ova[5] implanted into the uterus of the defendant Melissa Carroll, who agreed to act as a gestational carrier for the plaintiffs pursuant to a gestational carrier contract with them. The judge ordered the entry of a judgment dismissing the complaint because of a "lack of clarity and certainty as to this

---

[3]"Embryo" is defined as "the developing organism from conception until approximately the end of the second month." Stedman's Medical Dictionary 559 (26th ed. 1995).

[4]"Sperm" or "spermatozoon" is defined as "[t]he male gamete or sex cell that contains the genetic information to be transmitted by the male." Stedman's Medical Dictionary, *supra* at 1644, 1645.

[5]"Ovum" is defined as "[t]he female sex cell. When fertilized by a spermatozoon, [it] is capable of developing into a new individual of the same species; during maturation, [it], like the spermatozoon, undergoes a halving of its chromosomal complement so that, at its union with the male gamete, the species number of chromosomes (46 in humans) is maintained . . . ." Stedman's Medical Dictionary, *supra* at 1275.

[c]ourt's authority" to grant the relief sought. We conclude that the judge had authority to decide the merits of the complaint. We also conclude that, on the facts of this case, a judgment should enter declaring that the plaintiffs are the legal parents of the children, and ordering the hospital, through its reporters, to place the plaintiffs' names on all "record[s] of birth" created pursuant to G. L. c. 46, §§ 1, 3, 3A, listing the plaintiffs as the mother and father, respectively, of the children.

The facts of this case are undisputed. We now summarize those facts and provide an overview of the case's procedural background. The plaintiffs and the defendant Melissa Carroll (gestational carrier), a single woman over the age of twenty-one years who had "at least one previous live birth," entered into a gestational carrier contract. Pursuant to the contract, the gestational carrier agreed to have implanted into her uterus embryos that were created from the sperm of Steven Culliton and the ova of Marla Culliton; to carry and deliver any child resulting from the embryo implantation; and, upon the birth of any child resulting from the embryo implantation, to permit the plaintiffs to have sole physical and legal custody of the child or children. For her role, the gestational carrier was to receive certain financial compensation.[6] The contract appears to have been executed because Marla "is capable of conceiving a child, but incapable of bearing and giving birth to a child without unreasonable risk to her health."

The gestational carrier underwent the embryo implantation and became pregnant with twins. A few months later, the plaintiffs filed a verified complaint in the Probate and Family Court seeking a declaration of paternity and maternity, as well as a prebirth order directing the hospital at which the gestational carrier was expected to deliver to designate the plaintiffs as the father and mother of the children on their birth certificates. Together with the complaint, the plaintiffs and the gestational

---

[6]Under the contract, the plaintiffs agreed to pay the gestational carrier for certain medical expenses, maternity clothing, travel expenses, childcare expenses, legal expenses, telephone expenses, medically necessitated lost wages, psychological counselling expenses, health insurance expenses, and living expenses. According to the contract, payment of these expenses was not conditioned "upon the termination of any parental rights or the placement of the child with [the plaintiffs]."

carrier filed a stipulation for the entry of judgment in the plaintiffs' favor.[7]

A judge in the Probate and Family Court, concluding that he did not have the authority to issue a prebirth order of parentage, ordered the entry of a judgment of dismissal. The judge also entered a written decision, in which he made findings of fact and conclusions of law. In his conclusions of law, the judge examined existing statutory and case law, noting the absence of any "controlling authority." He specifically examined statutes relating to adoption and paternity actions, noting that, pursuant to G. L. c. 209C, §§ 14 and 21, paternity and maternity judgments cannot be entered until after the birth of a child, and that, pursuant to G. L. c. 210, § 2, a prospective adoptive parent may not be declared the parent of a child without the written consent of the birth mother which shall be executed "no sooner than the fourth calendar day after the date of birth of the child." The judge identified and distinguished two decisions concerning surrogacy arrangements, see *Smith* v. *Brown*, 430 Mass. 1005 (1999); *R.R.* v. *M.H.*, 426 Mass. 501 (1998). He explained that the court in *R.R.* v. *M.H.*, *supra* at 509, was not concerned with an agreement to act as a gestational carrier. He further explained that the court in *Smith* v. *Brown*, *supra* at 1005-1006, did not decide issues similar to the one presented by this case because the report that presented the issues was improper and, consequently, had to be discharged.

The plaintiffs filed a notice of appeal, and the case was entered in the Appeals Court. That court, on motion by the plaintiffs, entered a preliminary injunction enjoining the hospital from issuing birth certificates until resolution of the appeal. The day before we transferred the case here, the twins were born. After transfer, we entered an order continuing the injunction in effect.

1. The judge acted prudently in seeking to place this case before us as quickly as possible because, as he correctly noted, there is no direct legal "authority for issuing a pre-birth order

[7]Also filed was an affidavit by the physician who implanted the gestational carrier with the plaintiffs' embryos. He stated that the children to be delivered by the gestational carrier "are the result of the implantation of the fertilized embryos of [the plaintiffs]."

regarding parentage under the facts of this case." Authority elsewhere is sparse and not altogether consistent.[8]

The pregnancy in issue is not governed by the statutes referred to by the judge. General Laws c. 209C, for instance, establishes procedures for determining paternity and maternity for children "born out of wedlock." See G. L. c. 209C, § 1 ("It is the purpose of this chapter to establish a means for [children born out of wedlock] either to be acknowledged by their parents voluntarily or, on complaint by one or the other of their parents or such other person or agency as is authorized to file a complaint . . . to have an acknowledgment or adjudication of their paternity . . ."). While the twins technically were born out of wedlock, because the gestational carrier was not married when she gave birth to them, it is undisputed that the twins were conceived by a married couple. In these circumstances the children should be presumed to be the children of marriage. See *C.C.* v. *A.B.*, 406 Mass. 679, 686 (1990). Conversely, problems would have arisen if the gestational carrier had been married at the time of birth, for, in those circumstances, under G. L.

---

[8]Compare *Belsito* v. *Clark*, 67 Ohio Misc. 2d 54, 56-58, 66 (1994) (probate judge entered order in uncontested case declaring genetic parents as legal parents of child carried by gestational carrier, and ordered, on birth of child, that genetic parents' names be listed on child's birth certificate) with *A.H.W.* v. *G.H.B.*, 339 N.J. Super. 495, 496-497 (2000) (Superior Court judge refused to enter prebirth order listing genetic parents of baby carried by gestational carrier as baby's parents on birth certificate despite fact that both genetic parents and gestational carrier sought such relief; judge concluded that requested order could enter only after seventy-two hour statutory waiting period expired permitting gestational carrier time to contemplate surrendering her parental rights). See also *Arredondo* v. *Nodelman*, 163 Misc. 2d 757, 758-759 (N.Y. Sup. Ct. 1994) (Supreme Court judge granted uncontested postbirth petition of genetic parents of children born pursuant to gestational carrier arrangement to declare genetic mother the legal mother of said children and to order issuance of new birth records so to reflect). But see *Matter of Andres A.*, 156 Misc. 2d 65 (N.Y. Fam. Ct. 1992). The plaintiffs argue that we be guided by *Johnson* v. *Calvert*, 5 Cal. 4th 84, 87, 100, cert. denied, 510 U.S. 874, and cert. dismissed sub nom. *Baby Boy J.* v. *Johnson*, 510 U.S. 938 (1993) (examining intent of parties to gestational carrier arrangement and concluding that genetic parents, a married couple who "intended to procreate a child genetically related to them by the only available means," were child's legal parents). That case, decided by California's highest court, raises different concerns and is distinguishable because, unlike the facts here, there was a dispute between the genetic parents and the gestational carrier over the parentage of the child. *Id.* at 87-88.

c. 209C, her husband would be presumed to be the father of the children to whom she gave birth. See G. L. c. 209C, § 6 (providing that "a man is presumed to be the father of a child . . . if . . . he is or has been married to the mother and the child was born during the marriage"). Additionally, under the statute, in contested cases, one method of proving paternity involves soliciting testimony from one parent concerning the occurrence of "sexual intercourse" with the other party during the "probable period of conception." G. L. c. 209C, § 8. See also G. L. c. 209C, § 16 (*d*). As shown by the facts of this case, reproductive advances have eliminated the necessity of having sexual intercourse in order to procreate. It is apparent, after examining the paternity statute in detail, that the statute is simply an inadequate and inappropriate device to resolve parentage determinations of children born from this type of gestational surrogacy.

Nor does the adoption statute, G. L. c. 210, furnish any better guidance. While this court has previously looked to the adoption statute in deciding whether to enforce a traditional surrogacy agreement, see *R.R.* v. *M.H.*, *supra* at 510-511, the court did so "to assure that no economic pressure will cause a woman . . . to act as a surrogate. . . . [C]ompensated surrogacy arrangements raise the concern that, under financial pressure, a woman will permit her body to be used and *her* child to be given away" (emphasis added). *Id.* at 511. In such an arrangement, the surrogate is both the genetic mother of the child and the mother who carries the child through pregnancy and delivery. The child is thus, undisputedly, "her" child to be surrendered for adoption. Here, where it is undisputed that the plaintiffs were not donating an embryo or embryos to the gestational carrier, and that the twins have no genetic relation to the gestational carrier, the concerns are different from those at issue in *R.R.* v. *M.H.*, *supra.* Also, in these circumstances, applying the four-day waiting period of G. L. c. 210, § 2, to this gestational carrier arrangement would work unintended, and possibly detrimental, results. The duties and responsibilities of parenthood (for example, support and custody) would lie with the gestational carrier for at least four days; the gestational carrier could be free to surrender the children for adoption; and the

genetic parents of the children would be forced to go through the adoption process, possibly having to wait as long as six months, see G. L. c. 210, § 5A ("[n]o decree shall be made upon [a petition for adoption] . . . until the child shall have resided for not less than six months in the home of the petitioner; provided, that for good cause shown the court may, in its discretion, waive the requirement of residence"), before becoming the legal parents of the children. As is evident from its provisions, the adoption statute was not intended to resolve parentage issues arising from gestational surrogacy agreements.

Contrary to the plaintiffs' contention, G. L. c. 46, § 4B, does not authorize the relief sought in this case. That statute provides that "[a]ny child born to a married woman as a result of artificial insemination with the consent of her husband, shall be considered the legitimate child of the mother and such husband." G. L. c. 46, § 4B. As we explained in *R.R.* v. *M.H.*, *supra* at 510, § 4B "seems to concern the status of a child born to a fertile mother whose husband, presumably infertile, consented to her artificial insemination with the sperm of another man so that the couple could have a child biologically related to the mother." The situation that § 4B addresses is not present here. The statute does not apply.

As noted by the judge, in *Smith* v. *Brown, supra*, we faced several issues, some similar to those involved here, raised in connection with a gestational surrogacy arrangement, but refrained from commenting on those issues because we concluded that the case had been improperly reported. *Id.* at 1005-1006. However, in dicta we stated that "[t]he Probate and Family Court may wish to consider a protocol that . . . allows parties to a gestational surrogacy arrangement such as this one (which involves relatives who have agreed on all matters and have supported their complaint with affidavits) to seek the entry of a judgment pursuant to G. L. c. 215, § 6, if that statute is deemed appropriate, or pursuant to other authority, declaring maternity and paternity" (footnote omitted). *Id.* at 1006. Here, where (a) the plaintiffs are the sole genetic sources of the twins; (b) the gestational carrier agrees with the orders sought; (c) no one, including the hospital, has contested the complaint or petition; and (d) by filing the complaint and stipulation for judg-

ment the plaintiffs agree that they have waived any contradictory provisions in the contract (assuming those provisions could be enforced in the first place), we conclude that pursuant to the Probate and Family Court's general equity jurisdiction under G. L. c. 215, § 6, the judge had authority to consider the merits of the relief sought here.[9]

This conclusion acknowledges the importance of establishing the rights and responsibilities of parents as soon as is practically possible. By enacting G. L. c. 46, which contains provisions establishing a process for the issuance of accurate birth certificates on which the "parents" of a newly born child are listed, the Legislature has also recognized and addressed, in some measure, this concern. Delays in establishing parentage may, among other consequences, interfere with a child's medical treatment in the event of medical complications arising during or shortly after birth; may hinder or deprive a child of inheriting from his legal parents should a legal parent die intestate before a postbirth action could determine parentage; may hinder or deprive a child from collecting Social Security benefits under 42 U.S.C. § 402(d) (Supp. 1999); and may result in undesirable support obligations as well as custody disputes (potentially more likely in situations where the child is born with congenital malformations or anomalies, or medical disorders and diseases). Our holding provides that such consequences, at least in some circumstances, can be minimized or avoided, thus furnishing a measure of stability and protection to children born through such gestational surrogacy arrangements. See *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 827-828, cert. denied, 528 U.S. 1005 (1999) ("[t]he court's duty as parens patriae necessitates that its equitable powers extend to protecting the best interests of children . . .").

---

[9]This conclusion takes into account a fact apparently overlooked by the plaintiffs, namely, that a hospital's reporters do not "issue" birth certificates. Rather, they furnish certain information pursuant to G. L. c. 46, §§ 1, 3, 3A, including the identity of the "parents" of the child born, which, in turn, is used by city and town clerks to "record" a complete "return of birth," which is commonly known as a person's birth certificate, see G. L. c. 46, §§ 1, 3, 3A, 4A. City or town clerks, the Commissioner of Public Health, or the State Registrar of Vital Records and Statistics may then furnish or "issue" a certified copy of the birth record to a parent. See G. L. c. 46, §§ 2A, 19, 19B, 19C.

2. In *Smith* v. *Brown, supra* at 1006, we suggested that a protocol for these types of cases be established. Such a protocol becomes increasingly necessary as infertile couples, and others, take advantage of existing and emerging assisted reproductive technologies, and as children are conceived and born through these technologies. The Legislature has responded to the cost concerns that infertile couples face in attempting to conceive by mandating health insurance companies to provide certain coverage for infertility treatments. See G. L. c. 175, § 47H; G. L. c. 176A, § 8K; G. L. c. 176B, § 4J; G. L. c. 176G, § 4. While responding to some parentage issues arising through artificial insemination, see G. L. c. 46, § 4B, the Legislature has not enacted laws to determine parentage of children born from other methods of reproductive technologies or assisted conception. The Legislature is the most suitable forum to deal with the questions involved in this case, and other questions as yet unlitigated, by providing a comprehensive set of laws that deal with the medical, legal, and ethical aspects of these practices.

While establishing parentage is critically important, we cannot ignore additional considerations that surface from such a decision and resulting orders, in particular, those considerations identified by the Commissioner of the Department of Public Health (department) and his appointed Registrar of Vital Records and Statistics (registrar). The department and registrar are the State officials charged with the registration of births, marriages and deaths within the Commonwealth. G. L. c. 17, § 4. In the case of births, a hospital's reporters must provide certain information to the department in addition to listing the "parents" of a child born. See G. L. c. 46, §§ 1, 3, 3A. They are required to report facts and statistical information about the birth on forms prepared and furnished by the department, including a "hospital worksheet." Copies of these forms are then filed with the registrar or city or town clerk. *Id.* See G. L. c. 111, § 24B. In addition to information that will appear on a child's birth certificate, such as the identity of the "parents" of the child, the reporters are required to provide certain confidential information including the length of pregnancy, prenatal care, complications related to pregnancy, labor and delivery

procedures, complications of labor and delivery, neonatal conditions and procedures, congenital malformations and anomalies of the child, the child's weight, and the child's Apgar score. See 105 Code Mass. Regs. § 130.627 (1999).

The department uses the reported information to monitor maternal and infant health and mortality, as well as to conduct research on births from assisted reproductive technology.[10] Further, as stated in their brief, the department and the registrar rely on the data "to identify maternal deaths and significant maternal morbidities during the antepartum, intrapartum (labor and delivery) and postpartum period; to develop effective strategies to prevent future events of a similar nature; to reduce the incidence of maternal death and pregnancy complications and to improve birth outcomes. The [d]epartment uses data from vital records and other sources to assess the magnitude of pregnancy-related mortality and morbidity; to examine trends; to identify groups at increased risk, and to identify problems within the health care system. Surveillance, review and analysis of this data guides the development of appropriate, effective interventions to decrease risks associated with pregnancy and childbirth and to improve the health of women and children." Additionally, as to information concerning children born from assisted reproductive technology, the reported information helps the department identify risks associated with assisted reproductive technology, such as pregnancy complications (including hemorrhages and Caesarean sections) experienced by the women delivering, multiple births and "associated complications such as preterm delivery and low birth weight," and the possibility of birth defects and genetic mutations.

We agree with the department and registrar that in cases such as this one, the delayed transmission of the reported information

---

[10]The amicus brief of the department and the registrar adopts the definition of "assisted reproductive technology" employed by the United States Department of Health and Human Services Centers for Disease Control: assisted reproductive technology consists of "fertility treatments in which eggs are removed from a woman's ovaries combining them with sperm in a laboratory and returned to the woman's body or donated to another woman. Excluded from this definition are: (a) procedures in which only sperm are handled, e.g., artificial insemination, and (b) procedures where a woman takes medication to stimulate egg production without having the eggs removed."

may diminish its significance for research and public health purposes. Of more concern are the consequences resulting from the absence of such information, particularly, the absence of a record of the identity of, and information concerning, the gestational carrier or woman who delivered the child. We note that G. L. c. 46, § 1, requires that the "parents" of the child be provided, not the identity of the woman who delivered the child. While in most cases this difference is without distinction, the requisite forms to be completed by the reporters clearly seek information about the woman who actually delivered the child, and there is no reason why this information cannot be provided, particularly where it is confidential and does not appear on a child's birth certificate.

So that the department may fully discharge its duties and responsibilities, we conclude that, in cases such as this case, the party or parties commencing an action seeking relief with respect to any information contained in a birth certificate or with respect to any of the information required to be supplied by the hospital's reporters pursuant to G. L. c. 46 and related regulations should notify the registrar of the commencement of that action. The party or parties should also notify the registrar of any orders or judgments concerning the same. This conclusion does not relieve the hospital's reporters of the duty to supply the department or registrar with the confidential information concerning the identity of the woman who delivered the children — the gestational carrier — as well as all required information concerning the gestational carrier, including her prenatal health, labor and delivery, and postpartum care and condition.

3. Ordinarily at this point we would remand the case to the Probate and Family Court for further proceedings because we have been concerned only with the authority of the judge to act on this complaint. However, a remand is unnecessary in this case. A stipulation for the entry of judgment has been submitted by all parties. The concerns of the department and registrar have been addressed. Since the complaint was filed, the twins have been born. It is consequently now appropriate to order the entry of a judgment declaring the plaintiffs the lawful parents of the twins.

4. The judgment of dismissal is vacated. The preliminary

injunction enjoining the hospital from complying with its statutory obligations for the children is dissolved. A judgment is to enter declaring the plaintiffs as the legal parents of the children and ordering the hospital, through its reporters, to place the plaintiffs' names on its "record[s] of birth" created pursuant to G. L. c. 46, §§ 1, 3, 3A, listing the plaintiffs as the mother and father, respectively, of the children.

*So ordered.*