KEANU, GUARDIANSHIP OF, 100 Mass. App. Ct. 64

 
 GUARDIANSHIP OF KEANU [Note 1] (and a companion case [Note 2]).

100 Mass. App. Ct. 64
 February 10, 2021 - July 22, 2021

Court Below: Probate and Family Court, Hampden Division
Present: Green, C.J., Meade, & Rubin, JJ.

 

Parent and Child, Surrogacy agreement, Custody of minor, Adoption, Dispensing with parent's consent to adoption. Adoption, Dispensing with parent's consent, Visitation rights. Minor, Adoption, Custody, Visitation rights. Contract, Surrogacy agreement. Social Media. Public Policy. Practice, Civil, Adoption, Guardianship proceeding. Probate Court, Custody of child.

Given the unusual circumstances of a case involving an informal surrogacy agreement, in which the biological parents of the child sought to terminate a guardianship to which they had consented four days after the child's birth and in which the guardian sought to adopt the child, who had lived with the guardian since birth, the Probate and Family Court judge properly concluded that the biological parents were unfit to care for the child and that the child's best interests would be served by terminating their parental rights to withhold their consent to adoption by the guardian. [74-77]

PETITION for appointment of guardian of minor filed in the Hampden Division of the Probate and Family Court Department on December 14, 2017.

 Petition for adoption filed in the Hampden Division of the Probate and Family Court Department on August 13, 2018.

 The cases were heard by Ellen M. Randle, J.

Sarah LoPresti, Committee for Public Counsel Services, for the mother.

Daniel R. Katz for the father.

Heather-Jill K. Williams for the guardian.

Jacqueline Y. Parker for the child.

 RUBIN, J. This terribly unfortunate case highlights the need for legislation setting out comprehensive rules governing surrogacy and the lawfulness of, and requirements for, surrogacy arrangements and contracts. Although the Supreme Judicial Court concluded more than twenty years ago that surrogacy contracts may

 Page 65 

 be lawful, see R.R. v. M.H., 426 Mass. 501, 512 (1998), the details of what such contracts require, and when they may be used, remain largely undefined. This case highlights the need for clarity and predictability with respect to these areas of the law, so that the risks of instability and the costs attendant on surrogacy may be reduced in order to protect children born through surrogacy, as well as the intended and biological parents (and, where relevant, the gestational carrier). Until such legislation is enacted, this case also is a cautionary tale about the risks of an informal surrogacy.

 Background. After trial, a judge of the Probate and Family Court found the following facts, supplemented by undisputed evidence from the record. This case began with a public Facebook post by the appellee (hereinafter intended mother), which read, "[W]ho wants to pop out a baby for my fiancé and I?!" The appellant (hereinafter biological mother), who had never met the intended mother, was Facebook "friends" with her. The intended mother was at the time in a romantic relationship with a woman who had known the biological mother in third grade (hereinafter Ms. R.), but the two had not communicated since elementary school. Shortly thereafter, the biological mother sent a private message via Facebook to the intended mother, and they had the following conversation:

Biological mother: "Hey, if you and [Ms. R.] were serious about a baby and you wanted to do an adoption like you said then I would do it. I use [Note 3] to be friends with [Ms. R.] in like 3rd grade. I was reading some of your comments and I get the situation. It will be expensive doing it other ways. If you guys were ready and wouldnt back out I'm pretty sure i could do it. I get some people say they couldnt do it or it would be heartless to just give up a baby but it's not because it would be helping out someone who can't or for w.e [whatever] the situation is. I wouldnt want money or anything. If you guys are being serious, when you and if you really want a baby and you guys don't want to go about it another way, then I would have a baby and do an adoption for you guys."

Intended mother: "Honestly, that's so amazing of you. That's so selfless and I just can't even believe you'd do that for us. We were hoping to do it within the next 4-6 months so we'll be all set with careers for when he or she is here. I'd owe you

 Page 66 

 forever [heart emoji] I'd buy the extra prenatals an such for you and everything you need."

Biological mother: "I have health insurance so it would all be covered. All you guys would have to do is buy everything you need and want for the baby. Also you guys can go to all the appointment. And of course be there for the birth. If you really want a baby I will do it."

Intended mother: "We really do, so badly. My body is too bad for a pregnancy and I'm on meds and such that I can't come off, and [Ms. R.] can't even have kids so this really is our only option. This would be perfect, I just don't know how it works once the baby is born I think I'll need a lawyer but that's no big deal."

Biological mother: "I think we would all like myself the dad and you both would have to sign a ton of papers. But if you guys want to get together sometime to talk about it later on around the time when you guys want a baby then we could all talk about it. We would probably need a lawyer for all the papers and agreements. But I have np [no problem] with anything. I know you guys would make amazing parents. And I think that I'm okay with this because I know you both and that makes it easier then doing it for random people."

Intended mother: "And that's exactly how I feel, I don't want to just take someone randoms baby, if I'm going to the appointments and I know you I'll feel so much better about the whole thing. I can start researching what we'd have to do, even call a lawyer help line and ask them the direction to go in."

Biological mother: "Okay. If you want to do that and you guys talk it over and everything then we could meet up like I was saying and discuss it all as well."

Intended mother: "Yeah that's perfect, I just want to know if you'd wanna see the baby? Besides social media? Have play dates and such or would you completely want no contact? Either way is okay with me whatever you're comfortable with."

Biological mother: "Honestly I'm having a baby for you both so that would be 100% up to you both. I wouldnt want to 

 Page 67 

make anything weird or uncomfortable for any of us. I wouldnt want to be like mommy or tell the baby like that's your brother and sister. Later when the baby was old enough if you guys wanted to tell the baby he/she was adopted from us that would be okay."

Intended mother: "I think that would be a good idea, wait until it's questioned or asked about. I totally get it, we'll do a no contact then and stay social media admiring lol [laughing out loud]."

Biological mother: "Lmao [laughing my ass off] that sounds great. Iv been reading our messages to my bf [boyfriend] too and he agrees to this all too. Like I would hate if I couldn't have kids and had to go through so much and for it to be way expensive just to have a baby. I have a boy and a girl so I'm Good. I feel bad for couples who can't have baby's when they want a family so bad. They have to go through so much, but yet people who dont even want kids just pop them out like it's nothing lol. I would definitely probably stalk your fb [Facebook] to see pics haha."

Intended mother: "I'm so glad he's so open to it too, you're both amazing honestly. Exactly! Like my ex . . . is pregnant . . . like what . . . it's not fair she can't be a mom and here I am wanting it more than anything ever and I can't have it so easily. Once again, so selfless, both of you thank you so much."

 After an unknown gap of time, the conversation between the biological mother and intended mother continued:

Intended mother: "thanks for having faith in us being parents and trusting us with something so precious."

Biological mother: "If I had any doubt in either of you I wouldn't have messaged you or offered up a baby [crying laughter face emoji] but like you were saying if you want to do the research and everything and find out what we need to do we are 110% in on this and we can all talk about everything."

Intended mother: "So amazing [heart emoji] I'm literally going to speak to a lawyer first thing Monday morning and see what the process would be and once I find out we can meet up and talk."

 Page 68 

Biological mother: "Okay sound good. Also, you guys will be in charge of name picking lol. So first middle and last, if it's going to be yours or [Ms. R.'s]. I would feel better and more like this baby is for you both if you guys do that. [heart emoji] I can't wait to hear what the lawyer says. Hopefully its not so complicated."

 After the intended mother responded that the process could be complicated, the biological mother said:

Biological mother: "Idc [I don't care] what the lawyer says. If he's like well this could be an issue or w.e. Like I'm having a baby for this couple end of story. Everyone with kids aren't perfect and you guys are doing great in life. Like great relationship you have a place to live if you can afford the baby then great. He's not going to nitpick stupid stuff because I really don't care lol. We're trying to make this as easy as we possibly can."

Intended mother: "Yeah exactly! Like I hope they don't pull home checks and such like adoption agencies do, this is all private and I hope it stays that way with dcf [the Department of Children and Families] not in my life lol."

 A few days after the biological mother sent her initial message offering to have a baby for the intended mother and Ms. R., the intended mother informed the biological mother that neither she nor Ms. R. was going back to school and said to the biological mother:

Intended mother: "you can try starting whenever you want now [crying laughter face emoji]."

Biological mother: "That's so funny. You literally just changed everything in like 10 mins [four crying laughter face emojis] it's okay. This whole thing is up to you guys. Whenever you feel ready."

Intended mother: "Yeah we both knew for a while that we didn't want to do school, and there is better opportunities for [Ms. R.] elsewhere . . . ."

Biological mother: "Okay lol. So after st. Pattys weekend we will try lol."

 And so, as a result of this exchange on social media, the biological mother and her then-boyfriend, the biological father,

 Page 69 

 began attempting to conceive the child who is the subject of this action. They did this without the biological mother having met the intended mother, without her having communicated at all with the supposed second adoptive parent, Ms. R., and without either the intended mother or Ms. R. having so much as communicated directly with the biological father.

 The next day, the biological mother sent a message to the intended mother:

Biological mother: "So I went for an appt with my ob [obstetrician] today and she said if I'm going to do this to just start prenatals lol. So I'm going to pick some up Friday [smiley face emoji]."

Intended mother: "Are you sure they're covered? I can buy them for you."

Biological mother: "No it's fine were going to buy them. I guess they only cover it if I need a special kind or w.e. But we are good lol."

 About two weeks later, the biological mother sent the intended mother a picture of a completed ovulation test with a message that said:

Biological mother: "I bought the clear blue ovulation test and I just did it and this was the result lol. So we are still trying for you!"

Intended mother: "So the smiley is a good thing right? You're ovulating?"

 Biological mother: "Yes lol."

 Finally, after another roughly two weeks had passed, the biological mother sent the intended mother a photograph of a positive pregnancy test to which the intended mother responded, "Omg I'm gonna die of excitement [two crying laughter face emojis]."

 The biological mother and the intended mother continued messaging each other during the pregnancy about the health and development of the child. The child was born on December 13, 2017.

 From before the child's conception through his birth, the biological mother, and to the limited extent he was involved, her boyfriend, the biological father, treated the child as the intended mother's child. The biological mother, the biological father, the 

 Page 70 

intended mother, and Ms. R. were all present at the birth, at which time the child was immediately given to the intended mother, with whom he had skin-to-skin contact, and the child stayed with the intended mother and Ms. R. in a separate room in the hospital.

 The child was officially discharged by the hospital to the care of the biological mother and father, but immediately upon exiting the hospital, the newborn was given to the intended mother and Ms. R., who took him to the intended mother's residence where he has lived ever since.

 Knowing that the biological parents had given the child to the unrelated intended mother upon leaving the hospital, the hospital filed a G. L. c. 119, § 51A, report with the Department of Children and Families (department). The department investigated, conducted home studies for both the biological parents and the intended mother, and concluded that it had no concerns with either household.

 The day after the child's birth, the intended mother and Ms. R. filed a "Petition for Appointment of Guardian of Minor," and on the same day, the biological mother and father filed a notarized "Waiver and Consent to Petition for Guardian of Minor," pursuant to G. L. c. 190B, § 5-204. The biological parents also filed a "Caregiver Authorization Affidavit" pursuant to G. L. c. 201F, presumably to give the intended mother rights over the child during the time between the child's birth and the official appointment of the intended mother as guardian by the court; it gave the intended mother the right to "exercise concurrent rights and responsibilities relative to the education and health care of the child" "without obtaining further consent from a parent." [Note 4]

 The biological parents and the intended mother went to court on January 8, 2018, almost one month after the child's birth, and the biological parents consented to a permanent guardianship of the child with the intended mother. A decree appointing the intended mother as permanent guardian of the child, dated January 8, 2018, was docketed on January 12, 2018; it did not provide for any visitation or other contact between the biological mother

 Page 71 

 or father and the child. The informal agreement between the parties was that, as permitted by law, six months after the guardianship became official, the guardian would petition the court to adopt the child. See G. L. c. 210, § 5A.

 Just days after the child was brought home by the intended mother and Ms. R., Ms. R. broke up with the intended mother and moved out. The judge concluded that Ms. R. had in fact never wanted a child. At the time of the guardianship hearing, the biological mother was aware of the breakup as well as mental health issues of the intended mother, including depression and anxiety, but she still consented to the guardianship.

 A few months after the child was born, he was put on the biological mother's MassHealth account as a result of a clerical error, resulting in the removal from that account of one of the biological mother's own older children. This greatly upset the biological mother, and she sent a Facebook message to the intended mother telling her to "adopt" the child immediately or "give him back."

 The biological parents also were concerned that the intended mother planned to take the two month old child with her to a nail salon because the biological parents believed that it was not healthy or safe for the child. They also were concerned that the child had contracted respiratory syncytial virus at two and one-half weeks old, which he likely contracted from the intended mother's housemate's young daughter, and that the intended mother left the baby with her housemate in order to go to a concert in Pennsylvania and in order to go out one evening to a strip club with relatives. [Note 5]

 About four and one-half months after the child was born, due to the concerns the biological parents had regarding the intended mother's care of the child, the biological mother filed a petition to terminate the intended mother's guardianship, pursuant to G. L. c. 190B, § 5-311. About one month later, the biological father filed his own petition to terminate the guardianship, and the biological mother filed her first of several motions for parenting time. Neither biological parent had had any contact with the child since birth, nor had they sought any visitation with the child until the biological mother filed these motions for parenting time.

 Page 72 

 During the legal proceedings, the biological mother routinely shared information about this case on Facebook and she also posted negative comments about the intended mother on Facebook. For example, she posted, "She's [intended mother] is so selfish. Maybe he [child] would rather be with his entire REAL family whose trying him who were around the entire pregnancy unlike you. I carried him for 9 months. We have more of a bond the you ever will. I've been fighting since he was 4 months. We have been watching out for him, unlike you. You want to call yourself a mom, but all you care about is yourself. He belongs with his real family instead of in a home where he's just used to play house."

 In August of 2018, a brick was thrown through a window in the intended mother's home with a note that stated, "[H]e is mine." The judge drew the reasonable inference, based in part on the biological father's snickering in response to questions regarding his aggressive behavior toward the intended mother, that the biological father was the perpetrator.

 On January 1, 2019, the biological mother and father married despite a turbulent relationship -- a little more than one year before the marriage, the biological mother "cheated" on the biological father, and the biological father threatened to take his own life as a result. Even after their marriage, they continued to live separately for several months, and during trial, the biological parents had separate counsel, sat separately, and made little to no eye contact with each other.

 The trial. After about seven months had passed since the guardianship decree had entered, the intended mother filed a petition for adoption. In May of 2019, a Probate and Family Court judge held trial on the biological parents' petitions for removal of the guardian, the biological mother's petition for parenting time, and the intended mother's petition for adoption.

 The judge found the circumstances of the case to "shock the conscience of the Court." She found that the biological parents conceived a child that neither of them wanted in order to give the child to virtual strangers. She found that the biological parents had been unequivocal from prior to conception that the child belonged to and was the child of the intended mother. The biological mother referred to the baby as "it" or "[intended mother's] baby" while in the hospital, and even at trial, the biological mother failed to remember accurately the child's date of birth despite being able to remember her own children's dates of birth. The 

 Page 73 

judge found that the biological parents had no intention of having any contact with the child after birth other than following him on Facebook.

 The judge also found that the biological parents failed to show interest in or concern for the child even after birth. Despite learning about the intended mother's breakup with Ms. R. right after the birth of the child, and knowing of the intended mother's mental health struggles, the judge found that the biological parents had no apparent concern for how the situation would negatively impact the child. The judge was also troubled by the biological mother's demand that the intended mother either adopt the child "immediately" or "give him back" when one of her own older children was dropped from MassHealth coverage, because it indicated that the biological mother was evidently indifferent between those two options.

 More generally, the judge found that the biological parents had never sought visitation with the child prior to bringing their action, and that the biological parents made no efforts to connect with the child or obtain any information about his health and well-being prior to the commencement of legal proceedings. She found that they made only one request for information about the child shortly after the biological mother filed her petition to terminate the guardianship, the only attempt in the eighteen months between the child's birth and trial. The judge found that the biological parents' decision to try to get the child back "was just as capricious as their original decision to have him and give him away."

 The judge also found that neither the biological mother nor the biological father recognized the significance of the bond that had developed between the child and the intended mother, the only mother the child has ever known, and that they lacked insight into, and concern about, what would be necessary to safely effectuate a transition from custody of the intended mother to custody of the biological parents. The judge found that the biological parents intended to immediately and completely sever all contact between the intended mother and the child were they to prevail, and that they had no intention of allowing the intended mother to continue to have a role in the child's life, even on a transitional basis.

 The judge also made findings unique to each biological parent. She found that the biological father had never shown a legitimate interest in the child -- unlike the biological mother, the biological father never independently requested parenting time with the 

 Page 74 

child at all, even after he filed his petition to terminate the guardianship, and he stated at a hearing that he was "pretty sure" he wanted his son back. The biological father also repeatedly snickered throughout the proceedings, such as when he acknowledged that he had failed to appear for a number of hearings in these proceedings. Lastly, the judge drew the reasonable inference that the biological father threw the brick through the intended mother's window, placing the child at risk of physical harm since he did not know where the child was at that time. As for the biological mother, the judge found that she violated the child's privacy interests and exposed him to significant emotional harm in the future by posting intimate details about this situation on social media.

 The judge concluded that the biological mother and father were unfit to care for the child and that his best interests would be served by terminating their parental rights to withhold their consent to adoption and allowing adoption by the intended mother. The judge therefore denied the petitions to terminate the guardianship and the motion for parenting time, and terminated the parenting rights of the biological mother and father, allowing the adoption process to proceed without further notice to them. The biological mother and father have appealed.

 Discussion. Whatever the costs and difficulties attendant on adoption and the creation of enforceable surrogacy contracts in this Commonwealth, and whatever can be said for the selflessness that may attend a decision to conceive, carry, and deliver a biological child to be adopted by someone childless, the cavalier actions of the adults involved in this case have led, predictably, to years of uncertainty for the biological mother, the biological father, the intended mother, and, especially tragically, for the child. The process used by the parties to this case was inappropriate to the gravity of the agreement between, and conduct of, the adults involved, including the creation of a child by the biological mother and father to be given to the intended mother and her partner for adoption.

 The child argues that we should assess this case in light of the informal agreement for adoption and the fact that the child has lived with the intended mother his entire life. He argues that the consent formalized in the guardianship, more than four days after the child was born -- the period of time that must elapse before a binding written consent to adoption can be executed, see G. L. c. 210, § 2 -- should be given effect as though this case involved 

 Page 75 

a valid surrogacy contract and a consent to adoption, in order to ensure stability in the life of the child.

 As this argument was not raised below, we decline to reach it. See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006). In any event, the litigation of this question is completely underdeveloped. We would be concerned about applying a novel doctrine that essentially would equate what went on here with a formalized surrogacy contract and an agreement for adoption where what actually happened was an utterly informal agreement and the creation of a guardianship by consent. Given the procedural posture in which this argument is raised, it is impossible for us to assess what the consequences would be of treating such an informal arrangement as though it had the same consequence as the more formal arrangements for lawful surrogacy and adoption, with whatever their attendant safeguards might be -- something itself not outlined in the briefing before us.

 We think also that unless it is necessary for a court to do so, it would be prudent to allow the Legislature in the first instance to determine whether new legal standards are required to address informal surrogacy contracts like the one at issue here, the creation from before conception of nonbiological "intended parents," and so on. We note that the case law implies that surrogacy agreements may be enforceable "[i]f no compensation is paid [to the surrogate mother] beyond pregnancy-related expenses and if the [surrogate] mother is not bound by her consent . . . unless [that consent is given] after a suitable period has passed following the child's birth." [Note 6] R.R., 426 Mass. at 512. The court in R.R. noted other conditions that may be important in deciding whether a surrogacy agreement is enforceable, such as "a requirement that (a) the [surrogate] mother's [spouse] give . . . informed consent to the agreement in advance; (b) the [surrogate] mother be an adult and have had at least one successful pregnancy; (c) the [surrogate] mother, her [spouse], and the intended parents have been

 Page 76 

 evaluated for the soundness of their judgment and for their capacity to carry out the agreement; (d) the [intended parents] be incapable of bearing a child without endangering [their] health; (e) the intended parents be suitable persons to assume custody of the child; and (f) all parties have the advice of counsel." Id. However, the precise contours of what is required in order to effectuate surrogacy and adoption arrangements, something that this case indicates is essential, have never in the ensuing quarter century been addressed by the Legislature.

 We conclude that given the posture in which it was presented, the judge took the appropriate approach to this case, particularly given the constitutional issues involved, treating the biological parents as the parents of the child and the intended mother as his guardian who, with court approval, has care and custody of the child.

 Approaching the case in this way, the judge appropriately assessed, in reviewing the biological parents' petitions to terminate the guardianship, whether "the natural parents are currently fit to further the welfare and best interests of the child." Bezio v. Patenaude, 381 Mass. 563, 576 (1980). A parent may be unfit with respect to one child but not unfit as to another whose circumstances differ. See Adoption of Frederick, 405 Mass. 1, 9 (1989). While parental unfitness must be found by at least "clear and convincing evidence" (quotation and citation omitted), Guardianship of Clyde, 44 Mass. App. Ct. 767, 773 (1998), our case law has recognized that "the 'best interests of the child' test and the 'unfitness of the parent' test 'reflect different degrees of emphasis on the same factors, . . . the tests are not separate and distinct but cognate and connected,'" Bezio, supra at 577, quoting Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, 367 Mass. 631, 641 (1975). In considering the intended mother's petition for adoption, the judge properly asked whether termination of the biological parents' rights to consent to adoption was warranted due to their unfitness to parent the child, something that also must be demonstrated by clear and convincing evidence, Adoption of Ilona, 459 Mass. 53, 59 (2011), with the burden on the petitioning intended parent, compare Adoption of Lisette, 93 Mass. App. Ct. 284, 293 (2018) (department's burden), and whether the petitioner has proved that the best interests of the child would be served by ending all legal relations between the biological parents and the child. See Ilona, supra. Lastly, in determining whether the biological mother should have parenting time 

 Page 77 

with the child, the judge properly considered whether there is "a significant, existing bond with the biological parent" in determining whether visitation is in the best interest of the child. See id. at 63-64, quoting Adoption of Vito, 431 Mass. 550, 563 (2000).

 Although this is an exceedingly difficult case because of the high burden involved in terminating a parent's rights with respect to his or her child, we conclude that the facts found by the judge are sufficient to demonstrate the unfitness of both biological parents to parent this child by clear and convincing evidence. Thus, we see no abuse of discretion in the judge's denial of the petitions to terminate guardianship or her determination that the best interests of the child would be served by termination of the biological parents' rights and the adoption of the child by the only parent he has ever known, or her conclusion that it would be in the child's best interest to not allow parenting time by the biological mother where she has had no relationship with the child after birth.

 As a final note, we caution anyone considering a similarly informal surrogacy agreement that we have not held that such agreements are enforceable. And application of the tests for unfitness and best interests always turns on unique, fact-specific circumstances not "susceptible to mathematical precision" (quotation and citation omitted). Guardianship of Estelle, 70 Mass. App. Ct. 575, 580-581 (2007). Thus, notwithstanding the outcome here, the risks for an intended parent in entering into an informal arrangement such as this, rather than a formal surrogacy arrangement, are substantial -- and the risk to the child created pursuant to such an arrangement is even greater. Indeed, even in this case, and despite its outcome, the arrangement here resulted in multiyear litigation that has interfered with the stability and certainty of the situation of the child and of all the adults involved.

 Conclusion. On docket number HD17P2381GD, the decree dismissing the petitions for removal of guardian and for parenting time is affirmed. On docket number HD18A0058AD, the decree terminating parental rights is affirmed.

So ordered.

FOOTNOTES
[Note 1] A pseudonym. 

[Note 2] Adoption of Keanu. 

[Note 3] We reproduce the text as it appears in the Facebook messages. 

[Note 4] Pursuant to G. L. c. 201F, § 2, a parent may give permission to someone with whom their child lives to make medical and educational decisions for the child, making that person a caregiver. This process does not take away any parental rights to make decisions or child custody but allows the caregiver to make educational and medical decisions without first consulting with the parent. No forms need to be filed in court. The parent and caregiver need only to complete a caregiver authorization affidavit. 

[Note 5] The judge concluded that "[i]t was reasonable and appropriate for [the intended mother] to delegate responsibility for caring for [Keanu] to her friend" while going to these events. The intended mother testified that she went to the strip club because Ms. R's aunts "had invited [her] to go out with them," that she was away from home for three hours, and that she did not drink. 

[Note 6] We also note that the Supreme Judicial Court has enforced a gestational surrogacy agreement ("gestational surrogacy" as distinguished from "traditional surrogacy") -- meaning the gestational carrier does not provide the egg -- where "(a) the [intended parents] are the sole genetic sources of the [child]; (b) the gestational carrier agrees with the orders sought; (c) no one, including the hospital, has contested the complaint or petition; and (d) by filing the complaint and stipulation for judgment the [intended parents] agree that they have waived any contradictory provisions in the [gestational carrier] contract." Culliton v. Beth Israel Deaconess Med. Ctr., 435 Mass. 285, 290, 291-292 (2001). See Hodas v. Morin, 442 Mass. 544, 549 (2004). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.