NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-939

ADOPTION OF CORA (and three companion cases).[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following an evidentiary hearing on a review and redetermination motion brought by the Department of Children and Families (department) pursuant to G. L. c. 119, § 26, a judge of the Juvenile Court terminated the father's parental right to consent to the adoption of his four children.[2]  On appeal, the father principally argues that the evidence did not clearly and convincingly establish his unfitness and that the judge abused her discretion in finding that termination would serve the best interests of the children.  Although we agree that certain of the judge's subsidiary findings are erroneous, we conclude that those errors do not negate the clear and convincing evidence of

_____

[1] Adoption of Ava; Adoption of Sophia; and Adoption of Corey.  The children's names are pseudonyms.

[2] The mother's rights were also terminated.  She unfortunately died of cancer in September 2025.

unfitness.  We are unpersuaded by the father's other arguments.
Therefore, we affirm.

Background.  We summarize the judge's factual findings, reserving some details for later discussion.  The mother, a citizen of the Netherlands, came to the United States in 2015 on a tourist visa and shortly thereafter married the father, whom she had met online.  She remained in the United States without lawful immigration status until her death in 2025.  The mother had three children from previous relationships whom she brought with her from the Netherlands.[3]

The parents had their first child together, Cora, in April 2016.  Ava followed closely after, born prematurely in February 2017.  Because Ava was born substance exposed, a mandated reporter filed a report under G. L. c. 119, § 51A (51A report), bringing the family to the department's attention for the first time.

The department initially closed the family's clinical case in late 2017 but then reopened it a few months later following a

---

[3] None of these three children are at issue in this appeal, although the department did have prior interaction with them. By the time the parents' rights were terminated as to their shared children, the mother's two oldest children had reached the age of majority, and the third, who was named in the care and protection petition, had been returned to his father's permanent custody in the Netherlands and was dismissed from this case.  Hereinafter, we shall refer to these three children as the older children.

new 51A report.  Throughout the next two years, the department investigated various allegations of excessive school absences by one of the mother's older children, overcrowded and unsanitary living conditions in the family home, the children's hygiene and access to medical care, and the father's substance use.

In January 2020, the family was evicted from their home and resided temporarily in a hotel until obtaining a shelter placement.  Sophia was born substance exposed in March 2020.  At that time, four of the family's seven children were behind medically.  That fall, the department investigated a 51A report, evidently from the school district, that the mother's two school-aged children had not attended school for several months. The report was screened out based on assurances that one child would begin attending shortly and that the other child's transportation issues had been resolved.

The problems persisted in the following years.  In 2021, all of the children remained behind medically, and the department received another 51A report that one of the school-aged children was frequently late to or absent from school, but the family had not documented the reasons.  The report was screened out on the basis that the family was found to lack transportation and that the school's main concerns were actually

with the younger children, although they were not yet legally required to attend school.

By September 2022, the conditions of the family's shelter placement were unsanitary, with clothes and other items covering furniture and blocking walkways, and rotting food both in and outside of the kitchen.  Also in September 2022, approximately two weeks after the department drafted an emergency services plan to address the unsanitary housing conditions, the department discovered that the parents had had another child. After initially denying his existence, the parents eventually confirmed that Corey had been born at home in January 2022; the parents had instructed the older children not to tell anyone.[4] Corey had no birth certificate, had received no medical care since birth, and was malnourished and developmentally delayed. The department also remained concerned about the older children's school attendance and lack of medical care.  The department therefore filed this care and protection petition and was granted emergency custody of all four children.

The children have remained in foster care since removal and in August 2023 were placed together in the same preadoptive home.  At the October 2023 care and protection trial, both

_____

[4] The family's social worker had previously seen the father with baby Corey, but the father falsely said that he was babysitting.

4

parents appeared, the mother testified, and on the second day of trial the parents stipulated to their unfitness. Neither parent appeared at the review and redetermination hearing in November 2024.

Discussion. 1. Father's unfitness. We review a judge's decrees terminating parental rights to consent to adoption "to determine whether the judge's findings were clearly erroneous and whether they proved parental unfitness by clear and convincing evidence." Custody of Eleanor, 414 Mass. 795, 802 (1993). The clear and convincing evidence standard means that, for the ultimate finding of unfitness, "[t]he requisite proof must be strong and positive; it must be 'full, clear and decisive'" (citation omitted). Adoption of Iris, 43 Mass. App. Ct. 95, 105 (1997), S.C., 427 Mass. 582 (1998). Even where some subsidiary findings are erroneous, a judge's properly supported findings may be sufficient to prove parental unfitness by the proper legal standard. See, e.g., Adoption of Daniel, 58 Mass. App. Ct. 195, 200-201 (2003) (concluding, despite three erroneous subsidiary findings, that overall finding of unfitness was supported where supported findings "demonstrated that close attention has been paid to the record"). Cf. Custody of Eleanor, supra at 802 n.12 (reversal warranted where properly supported findings insufficient to prove unfitness).

5

a.  Negative inference.  "Where a parent has notice of a proceeding to determine his parental rights and the parent does not attend or provide an explanation for not attending, the absence may suggest that the parent has abandoned his rights in the child or cannot meet the child's best interests."  Adoption of Talik, 92 Mass. App. Ct. 367, 371-372 (2017).  A trial judge may draw this negative inference when doing so is "fair and reasonable based on all the circumstances and evidence before" her.  Id. at 372, quoting Singh v. Capuano, 468 Mass. 328, 334 (2014).  The judge here drew such an inference against the father, and we review that decision for abuse of discretion.  See Adoption of Talik, supra.

The father argues that the inference was inappropriate here because on the day of the hearing he was at the hospital with the mother for her cancer treatment.  Although we are sympathetic to the father's situation, we cannot say that the judge abused her discretion in the circumstances.

The judge had before her only the father's unsworn representation, made through counsel, that he was at the hospital with the mother.[5]  After the first day of the hearing,

---

[5] The department argues further that there was little evidence, at the time of trial, that the mother had cancer, as she had not provided documentation of such a diagnosis to the department, despite their requests that she do so.  Whether it was appropriate for the judge to draw a negative inference

the judge held the evidence open to give the parents an opportunity to appear, or to submit evidence of the mother's cancer and of both parents' presence at the hospital.  The only evidence thereafter submitted by either parent was a photograph of a hospital wristband displaying the mother's personal information and showing that she was admitted on the same day the hearing commenced.  There was no evidence that the father was present at the hospital.  Moreover, the judge also considered that the father had several open warrants at the time.

The judge was not required to credit the father's explanation that he was at the hospital.[6]  See Custody of Eleanor, 414 Mass. at 799 (deference given to judge's assessment of credibility and weighing of conflicting evidence).  The judge could reasonably have concluded that the father was (1) unwilling or unable to make the minimal effort required to provide some evidence of his whereabouts, or (2) unwilling to

_____

against the mother, does not affect her ability to do so against the father.  We nonetheless note that the judge's expressed doubts about the mother's cancer and the father's presence with the mother, may have inadvertently diminished confidence in the fairness of the decision.  See Adoption of Norbert, 83 Mass. App. Ct. 542, 547 (2013) (judge must avoid appearance of partisanship).

[6] We see no merit to the father's argument that the judge imputed to him the mother's lack of credibility.

7

come to the court house to protect his relationship with the children where doing so meant he would be required to address his open criminal cases, or (3) both. It was thus within the judge's discretion to draw the negative inference against the father and consider it, among other factors, in finding the father unfit.

b. Mental health and substance use. The father argues that there was insufficient evidence to support the judge's findings of the father's mental health struggles and substance use, and, as a result, there was no nexus between any such deficiencies and his parental fitness. See Adoption of Jacob, 99 Mass. App. Ct. 258, 265 (2021) (nexus requirement). We address each issue in turn.

As to mental health, we agree with the father that the department did not establish by a preponderance of the evidence that he had any such problems. The judge made a passing reference to the fact that, "[a]t some point, Father was engaged in therapy," but otherwise did not make any factual findings relating to the father's mental health. Although the record indicates that the father either denied having any mental health problems or would not give the department information about any such problems, those do not constitute evidence that such problems existed. The judge nevertheless concluded that both

8

parents "struggle with grievous shortcomings" including "unaddressed mental health concerns." Although it is not entirely clear that the judge intended to find that each parent suffered from all of the shortcomings she listed, any finding that the father struggles with mental health was clearly erroneous.

As to substance use, however, we disagree with the father's claim that the department's proof was inadequate. The department presented evidence that in late 2018, the father admitted to using heroin multiple times a day, and brought it to work, causing him to lose the job that was the family's sole source of income. The evidence was in the form of a police report, which the judge admitted to show the department social worker's understanding. The father had also been arrested for possession of heroin in June 2024, five months before the review and redetermination hearing. Both he and the mother had heroin on their persons. The father denied that these incidents occurred. He refused to complete drug screenings ordered through the court's probation department. The department had obtained a substance treatment referral for him but, despite repeated efforts, had been unable to contact him. This gave the

judge sufficient basis to be concerned that the father was misusing heroin.[7]

Even so, the department failed to show any strong connection between these concerns and the father's current and future ability to provide minimally acceptable care for the children. The judge made no findings indicating that the father's substance use ever caused him to behave inappropriately or unsafely around the children. Nor did she find any connection between the father's substance use and the neglect that the children experienced in the parents' care. While illegal substance use is certainly not an ideal parenting trait, it is not itself a basis to find a parent unfit absent a link to some abuse or neglect of the children. See Adoption of Katharine, 42 Mass. App. Ct. 25, 33-34 (1997). No such link was found here.[8]

---

[7] We note that, unlike the mother, the father's action plan tasks did not include that he refrain from substance use, but it did include that he refrain from purchasing illegal substances and complete a substance abuse evaluation and adhere to all recommendations. While an action plan may illustrate the department's concerns about a parent's deficiencies, and a parent's noncompliance with the plan is relevant to determining unfitness, see Adoption of Yalena, 100 Mass. App. Ct. 542, 552-553 (2021); Adoption of Leland, 65 Mass. App. Ct. 580, 585 (2006), a judge is by no means restricted to considering only those issues that concerned the department.

[8] Although the father may have lost his job in 2018 due to drug use, he was employed at the time of the review and redetermination hearing. And the judge made no finding that his

However, even though the department did not demonstrate a link between the father's substance use and the neglect of his children, it did not need to do so if the neglect alone was sufficient to establish unfitness, see Custody of a Minor, 377 Mass. 876, 883 (1979) (pattern of parental neglect sufficient to determine unfitness), the issue to which we now turn.

c. Neglect. The father argues that the judge erroneously found the children to have suffered severe neglect, where the evidence shows that they were happy and loved. We have no doubt that the father loves his children, and his bond with them is reflected in the judge's order for posttermination and postadoption visitation. Nevertheless, his argument does not negate the judge's findings about neglect, nor are those findings clearly erroneous.

To begin, a primary concern while the parents had custody was that the children were frequently without health insurance, despite their eligibility for MassHealth, and were behind on medical appointments and vaccinations. When the children came into care, Cora and Sophia were up to date with immunizations, but Ava was not, nor was their older half-sibling, who was also removed. None of the girls had ever been to a dentist, and

arrest for heroin possession in 2024 showed a likelihood of future enforced separation from or other harm to the children.

11

their teeth were in poor condition.  Most concerningly, there was no record of Corey ever being seen by a medical provider in his first eight months of life, and the judge did not credit the mother's account of taking Corey to an unspecified hospital in another State under a false name.  From this evidence, the judge could properly have found that the children were subject to medical and dental neglect while in their parents' care.

The judge also considered that the parents did not provide for the then-youngest children's consistent participation in early intervention at the beginning of the case (when Sophia and Corey were not yet born).  The department had referred Ava for early intervention in 2017, but in 2018 her attendance at appointments was inconsistent; as of 2019, her early intervention worker had not seen her for "a while"; and as of 2020, her attendance was "poor."  The department completed another early intervention referral in 2020, but "the parents did not meet with the service because they did not have a phone."  The judge found this was "not a valid excuse to avoid Early Intervention services -- or any other services -- for the children."[9]  As of mid-2023, the parents were not in regular contact with recommended early intervention programs.  Against this backdrop, the judge could appropriately be concerned that

_____

[9] The mother refused to accept a free phone.

the younger children would face "educational neglect" similar to what schools had reported about their older siblings' attendance problems.

Moreover, "[t]he cleanliness of a parent's home is an appropriate factor for consideration in determination of that parent's fitness" (citation omitted). Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). The poor condition of the family's home was an ongoing and worsening problem over the years. In 2019, before the family lost their home, there were items piled from floor to ceiling filling portions of multiple rooms, the kitchen sink was full of multiple days' worth of dirty dishes, food was left out on the counter, and there was an "overpowering" odor of feline urine. The parents refused an offer of home cleaning services.

By September 2022, shortly before the children were removed, conditions had worsened; the family's home was so cluttered that it became difficult to move between rooms, there was rotting food in the refrigerator, and a pot by the kitchen door was "covered with maggots." The judge saw photographs confirming these reports. Such conditions further demonstrate that the father was unable to provide appropriate, safe, and hygienic housing for his children. See Adoption of Vito, 47 Mass. App. Ct. 349, 353 (1999), S.C., 431 Mass. 550 (2000)

13

(inability to secure adequate housing was factor bearing on fitness).  See also 110 Code Mass. Regs. § 2.00 (2016) (defining "Neglect" to include failure to provide children with minimally adequate shelter).

The father argues that the judge's finding of neglect was erroneous, as evidenced by the department's not removing the children sooner.  We are unpersuaded.  First, the fact that the department did not remove the children sooner is not affirmative evidence of anything.  Second, accepting that the children had not yet experienced serious harm from the parents' neglect prior to removal, "neither agencies responsible for the welfare of children nor judges sitting on these sorts of custodial questions need to wait for inevitable disaster to happen." Adoption of Katharine, 42 Mass. App. Ct. at 32.  See Adoption of Inez, 428 Mass. 717, 724 (1999) ("At some point the court must say, 'Enough,' . . . and act in the children's best interests" [citation omitted]).

Indeed, the children were already beginning to experience the consequences of their ongoing neglect.  When entering care, Cora (then six and one-half years old) and Ava (then five and one-half) still required pullups, and Ava would relieve herself wherever she happened to be -- issues that were quickly remedied after they were removed from their parents' custody.  All three

14

girls had cavities due to lack of dental care.  Sophia had an untreated lazy eye.  Corey was malnourished, had no medical records, and had delays in growth and in fine motor and language milestones.  Furthermore, the parents had a pattern of neglecting the older children's routine medical care and of tolerating continually worsening sanitary conditions in their home.  Taking all of this evidence into consideration, the judge properly found that the children had been neglected, were likely to continue to face such neglect, and that the father was unfit because he was unable to meet the children's basic needs at the time of trial and likely indefinitely.

Finally, to the extent that the father argues that the judge erroneously found that the children have "specialized needs," we disagree.  The record supports the judge's finding, that Cora was behind academically, Ava was diagnosed with attention deficit hyperactivity disorder, Sophia had ongoing treatment involving multiple doctors for her lazy eye, and Corey was developmentally delayed and being assessed for an individualized education program.  These findings reflect that all of the children have some type of specialized educational or medical need.  These needs,[10] combined with what the judge found

_____

[10] We understand the term "specialized needs," as used in the judge's decision, to refer to each child's particular needs. See Adoption of Warren, 44 Mass. App. Ct. 620, 626 (1998)

15

was the father's lack of familiarity with and inability to provide for these needs, "clearly establish parental unfitness." Petitions of the Dep't of Social Servs. to Dispense with Consent to Adoption, 18 Mass. App. Ct. 120, 125 (1984) (specialized needs of particular child combined with parental deficiencies "may clearly establish unfitness").

2. Best interests of the children. "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). Although parental unfitness does not always mandate a conclusion that the best interests of the children are served by termination of parental rights, see Adoption of Varnell, 106 Mass. App. Ct. 716, 722 (2026), "the tests are not separate and distinct but cognate and connected" (citation omitted). Guardianship of Keanu, 100 Mass. App. Ct. 64, 76 (2021).

Here, the evidence established that the children were subject to neglect while in their parents' care, the parents did

("parental fitness must be evaluated in the context of a particular child's needs"). The meaning of the term "special needs" as used by the judge at the hearing, is not entirely clear, but is of no moment, as her findings regarding specialized needs were supported by the evidence.

16

not improve despite years of departmental involvement,[11] the children's needs were being met in their preadoptive home, and they were strongly attached to their preadoptive parents.  Given the paucity of evidence that the father was likely to become a fit parent in the future, see Adoption of Bianca, 91 Mass. App. Ct. 428, 431 (2017), the judge did not abuse her discretion in concluding that termination of the father's rights, in order to provide the children stability in the shared home where their needs were met, was in their best interests.[12]

Decrees affirmed.

By the Court (Meade, Sacks & Wood, JJ.[13]),

*Paul Little*

Clerk

Entered:  June 22, 2026.

---

[11] Indeed, the increasingly unsanitary conditions of the home and the parents' decision to never seek medical care for Corey, and to conceal his birth, indicate that the parents' neglect increased, rather than lessened, over the years.

[12] We have not overlooked the father's remaining arguments, including that the children desire to and would not be harmed by transitioning back to his care and that he would be able to address their needs during such a transition.  What we have already said is sufficient to address these arguments. Additionally, whether the judge erred (as the father asserts) in taking judicial notice of the availability of Wi-Fi in hospitals, or of the (late) mother's eligibility for health insurance, is immaterial to our decision.

[13] The panelists are listed in order of seniority.